(266 P.3d 557)
No. 104,318

FRANK DENNING, SHERIFF OF JOHNSON COUNTY, KANSAS, *Appellee*, v. THE JOHNSON COUNTY, KANSAS, SHERIFF'S CIVIL SERVICE BOARD, *Appellee*, and MICHAEL MAURER, *Appellant*.

690

Opinion filed October 21, 2011.

*Morgan L. Roach* and *Jeff S. Kratofil*, of McCauley & Roach, LLC, of Kansas City, Missouri, for appellant, Michael Maurer.

*Michael F. Delaney* and *Michael C. Leitch*, of Spencer Fane Britt & Browne LLP, of Overland Park, for appellee Johnson County, Kansas, Sheriff's Civil Service Board.

*Lawrence L. Ferree, III*, and *Grant M. Hash*, of Ferree, Bunn, O'Grady & Rundberg, Chtd., of Overland Park, for appellee, Frank Denning.

Before LEBEN, P.J., GREEN and MARQUARDT, JJ.

MARQUARDT, J.: Michael Maurer appeals the district court's decisions of March 30, 2010, and January 8, 2009, terminating his employment with the Johnson County Sheriff's Department. We affirm.

On July 26, 2007, while Master Deputy Mike Maurer was driving from Topeka to the Johnson County Sheriff's Department with Deputy Darrin Eddy, a horsefly got into the police car. Maurer tossed a 5-pound notebook that had metal corners on it at the windshield trying to kill the horsefly. Immediately after Maurer hit the windshield with the notebook, both Eddy and Maurer noticed a spiderweb crack in the windshield. Maurer commented to Eddy that he wondered how he would explain the crack to his sergeant. On their return to the sheriff's department, Maurer put the car keys on his sergeant's desk with a post-it note saying "Crack—rock in windshield."

Sergeant Joe Greenwood found Maurer's post-it note the next morning and talked with Maurer between 7:30 and 8 a.m. When questioned about the crack, Maurer told Greenwood that "the windshield had spiderwebbed as the result of a rock chip the pre-

vious day." Deputy Eddy came in later and told Greenwood that Maurer had tried to kill the horsefly with the notebook and caused the windshield to crack.

Greenwood and Lieutenant Pinkelman inspected the windshield and could find no rock chip in the cracks. Because of the disparity in the two versions of the events that led to the windshield being cracked, Greenwood asked Maurer to prepare a written report and to be "as detailed as possible." The report form had the following words printed at the top: "DETAILS (REPORT ALL FACTS IN LOGICAL SEQUENCE)." At 10 a.m. on July 27, Maurer returned to Greenwood's office with a written report form dated July 26, 2007, which stated in its entirety:

"On 07-26-07 from 0800-1600 hours, I was assigned to Court Services. At approximately 1500 Hours, Deputy Eddy and I were returning from Topeka Juvenile Correctional Facility when a small chip in the windshield grew into crack. I believe I must have aggravated the chip when I attempted to kill a Horse Fly that we picked up in Topeka. As we drove the rest of the way back to Olathe, the small crack became larger.

"When I returned to the office, I placed a yellow post it note with the keys on Sergeant Greenwoods [*sic*] desk. Nothing further to report."

When Greenwood discussed this report with Maurer, Maurer did not tell Greenwood that he had thrown a pookette at the windshield. Pinkelman was provided with a copy of Maurer's report, and he asked Maurer to prepare a more detailed report. Maurer prepared a second written report also dated July 26, 2007, that stated in its entirety:

"On 07-26-07 from 0800-1600 hours, I was assigned to Court Services. At approximately 1500 Hours, Deputy Eddy and I were returning from Topeka Juvenile Correctional Facility, after dropping off an inmate. While driving down the highway, I attempted to kill a large horse fly that had gotten into the car. Not wanting to take a chance of this Horse Fly flying into my face while driving, I grabbed the only thing I could find, which was a blue smooth notebook (no binders) and attempted to kill it. I believe that striking the windshield aggravated a previous rock chip that grew into a 'spider web'. This action was in no way done, with any ill attempt to do damage to Unit 176. This was purely a[n] accident and I take full responsibility.

"When I returned to the office, everyone had already left for the day, so I placed a yellow 'post it note' with the keys on Sergeant Greenwood's desk. On the small note I wrote 'windshield cracked' (rock). The note was placed only as a precaution, so Sergeant Greenwood and the rest of the Court Services were informed of the defect. The small note I left with the keys, was not meant to be a complete explanation, nor to be interpreted as a 'report.' "

Based on Maurer's failure in his verbal and written reports to be honest about his role in cracking the windshield, Pinkelman determined that Maurer had violated the sheriff's department's truthfulness policy LL, which states:

"1.   Any intentional falsification of or any failure to disclose information relevant to suitability or fitness for employment may result in Administrative action.
  "a. Employees are prohibited from intentionally making any false statement(s) in connection with their performance of official duties or with their fitness for duty.
    1)   Making a false statement. (A)
  "b. Employees are prohibited from failing to disclose information in connection with the performance of their duties.
    1)   Failure to disclose information. (A)"

Captain Wayne Rector investigated Maurer's actions by interviewing officers and examining the evidence. The windshield was sent to the Johnson County's Criminalistics Laboratory for testing. The laboratory report stated:

"The direction of force could not be determined based on the damage observed on the windshield. Wallner lines and fractures are not reliable on laminated glass because the two sheets of glass are restricted in their movement by each other and the laminate material. A low velocity projectile could create this type of damage from impact on either side of the windshield."

During his internal investigation, Rector interviewed Maurer on August 7, 2007, and asked:

"Rector: . . . During the transport did you at any time during the transport witness a rock hit the windshield?
"Maurer: No.
"Rector: Okay, there's no issue of a rock hitting the windshield, all right. When, when Deputy Eddy pointed out the cracked windshield to you, after okay you guys have had this encounter with the horsefly and you've, you've thrown the blue folder up there and, and I don't know if the fly was killed or not, it doesn't really matter but at the point that the folder was removed and put back away you made a, you made a comment about a rock hitting the windshield, what did you say?
"Maurer: I just said it must have been, the rock must've started it and I just simply uh aggravated it. But I didn't mean a rock hit it that day, you know.
"Rector: All right, was it a joking comment that you made or was it a serious comment.
"Maurer: No it was just a off the wall comment.
  . . . .

"Maurer: . . . I write a report on it and yet I don't come out and jump up, or I don't go in there first thing in the mornin' say I'm the sole reason why this happened, that is why we're here, because I didn't wanna take full responsibility for it at first."

Captain Rector determined that Maurer had violated the sheriff's department truthfulness policy by not telling Greenwood initially that he caused the crack in the windshield. A Professional Standards Board (PSB) of the sheriff's department comprised of five deputies also conducted an investigation concerning Maurer's report of how the windshield was cracked. After the investigation, a hearing was held at which evidence and sworn testimony were admitted. Maurer was present at the hearing with his attorney and repeatedly asserted that he did not "feel" he was the sole cause of the cracked windshield.

Neither Maurer nor Eddy saw any chip in the windshield when they inspected the vehicle before leaving for their trip to Topeka. Maurer now claims that at some point while he was driving he saw a small chip on the outside of the passenger side of the windshield near the dash. Eddy, who was riding in the passenger seat, said he never saw any chip in the windshield.

The PSB considered Maurer's "statements and demeanor throughout his testimony" and felt that if Maurer could not be truthful about the windshield, "what would happen if he were placed in a situation where perhaps he knew his career, his marriage, etc would be compromised?" A violation of the department's truthfulness policy includes "failure to disclose information" in connection with an officer's duties. Maurer failed to disclose the fact that he threw a pookette at the windshield in his first three explanations for the windshield crack.

The PSB members stated that none of them would want to be Maurer's partner because they could not trust what he said. Therefore, the PSB concluded that termination was the only option because if they did not want to be Maurer's partner, "how could they place someone else in the department [with Maurer]." Sheriff Frank Denning affirmed the PSB's decision and terminated Maurer's employment. Maurer appealed his termination to the Johnson County Civil Service Board (CSB).

At the beginning of the CSB hearing on January 19, 2008, the chairperson stated: "We want to make these proceedings fairly informal." The CSB received exhibits from the sheriff; the summary from the PSB investigation; the transcript of the PSB's hearing; Denning's November 5, 2007, memo; Maurer's November 7, 2007, letter of appeal; and 123 pages of testimony from Maurer, Greenwood, and Undersheriff Cavanaugh. During the hearing, the chairperson stated: "We're also making a recording of this proceeding and it isn't our intention to vote today."

At the conclusion of the hearing, the CSB recessed and returned in 35 minutes, and notwithstanding its statement that no decision would be made that day, the CSB delivered its decision, stating:

"The board has obviously reviewed everything that we had prior to the hearing, the transcript and et cetera. We have also been very mindful and reviewed the statutes that relate to our authority in these kinds of matters and it is—this is a preliminary decision of the board, subject to us preparing a complete findings of fact and an order that we will submit to the parties and it will be the date that you receive the order that will begin the appeal process. . . .But it is the decision of the board that pursuant to 19-4327 that this board has the authority to either order reinstatement of the employee and payment of the employee of such salary as has been lost by reason of such dismiss[al] or to sustain the dismissal of such employee. And pursuant to 19-4327(d), it is the decision on this board on a three to one decision to go with the first and that is to order the reinstatement of the employee and the payment of the employee of such salary as has been lost by reason of such dismissal.

". . . Pursuant to the Administrative Procedures Act, the order will contain the appeal rights at the bottom of the order as required by law so that both sides have instructions as to the appealability of the decision of the Civil Service Board."

The CSB's oral decision included no findings of fact; it merely concluded that the sheriff was required to reinstate Maurer. Two months later, on March 12, 2008, the CSB issued a written decision in which it found that "there was no evidence to support the finding that a violation of LL occurred. CSB specifically finds and concludes that the two reports were, by all accounts, truthful."

Sheriff Denning appealed the CSB decision to the district court. On January 8, 2009, the district court held that the CSB's findings were unreasonable, arbitrary, capricious, and not supported by the facts. It found that the CSB never stated its standards for operation

and this "created an environment where the parties were unaware of the procedural and substantive rules guiding the CSB." The district court stated: "The CSB's duty is to determine whether there was substantial and competent evidence to support the Sheriff's decision" and remanded the case to the CSB "for further consideration under the appropriate legal standard and under rules and procedures adopted to give meaning and effect to the hearing that is authorized by K.S.A. 19-4327."

Maurer appealed, and this court dismissed the appeal because the district court's order was not a final order on all issues. Before the case was heard again by the CSB, the Johnson County Board of County Commissioners (Board) exercised its home rule authority and adopted Charter Resolution No. 040-08 (Charter Resolution) on July 31, 2008. The Charter Resolution exempted the CSB from the "provisions of K.S.A. 19-4304 through 19-4314, K.S.A. 19-4316 through 19-4318, in K.S.A. 19-4320 through 19-4328, and in K.S.A. 19-4331 through 19-4333" and adopted extensive operating rules and procedures for the CSB.

The Charter Resolution, *inter alia,* states:

"[Article VIII] SECTION 4. Civil Service Board Appeal Proceedings. The CSB shall hold an appeal hearing on the disciplinary action. The procedure for the hearing shall depend upon the proceedings conducted by the Sheriff's Office.

"a. Appeals on the Record. If the Sheriff's Office conducted a full hearing on the issues before a board of review, then the appeal before the CSB shall be a hearing on the record. The CSB shall review and consider the record of proceedings before the board of review. If the CSB determines that the proceedings provided the employee with a full and fair opportunity to hear the charges and evidence against him or her, a full and fair opportunity to confront the charges and evidence and to cross-examine the witnesses and rebut the evidence, and a full and fair consideration by the review board, the CSB shall limit its hearing to arguments of the parties, and to determine whether the decision of the Sheriff is supported by adequate evidence in the record and is not clearly unreasonable.

"b. Hearing on the Evidence. If the Sheriff's Office did not conduct a board of review or the record of those proceedings is either not available or inadequate to evaluate the decision, then the CSB shall hold a full hearing and receive evidence and testimony on the basis for and reasonableness of the disciplinary action.

. . . .

"SECTION 6. Decision of the CSB. After the hearing, the CSB shall deliberate and consider the arguments and/or evidence presented to it. The CSB shall consider and determine whether the employee was provided a full and fair opportunity to address the issues in the disciplinary process. If the CSB determines that the employee was not provided a full and fair process, then the CSB may stay the discipline and remand the matter back to the Sheriff's Office with directions to redo all or part of the process.

"If the CSB finds that the disciplinary process did provide a full and fair opportunity to the employee to address the issues, then the CSB shall determine whether the decision of the Sheriff was supported by adequate evidence in the record and whether the decision was clearly reasonable. The CSB shall give deference to the Sheriff's Office and shall not substitute its judgment for that of the Sheriff and will overturn the decision of the Sheriff only when no evidence in the record supports the decision or the decision is based on impermissible factors or the decision is clearly unreasonable and/or arbitrary.

"The CSB shall have authority to affirm the disciplinary action, to overturn the disciplinary action, or to propose optional relief, such as transfer to another Office or agency of the County.

"The decision of the CSB may be appealed to the district court for judicial review of its decision."

The second CSB hearing on May 15, 2009, was held using the rules and procedures adopted in the Charter Resolution. The CSB came to a different decision and affirmed Maurer's dismissal, finding:

"The Sheriff's decision to terminate Deputy Maurer's employment for a violation of Professional Standard LL, Truthfulness is supported by substantial evidence in the record that Deputy Maurer failed to disclose information in connection with the performance of his duties reasonably required to make his initial and subsequent reports of the incident not misleading."

The district court affirmed the second CSB's decision affirming Maurer's dismissal. Maurer filed a notice of appeal on April 26, 2010, which stated:

"Notice is hereby given that Appellant/Defendant Michael Maurer appeals from the Court's Final Decision ('Journal Entry' and attached 'Judge's Ruling') filed on March 30, 2010 and from the rulings contained in the Court's 'Memorandum Decision and Orders' filed on January 8, 2009 to the Court of Appeals of the State of Kansas."

2008 CSB Hearing and Order

*CSB's Standard of Review*

Maurer claims that the first CSB did not exceed its authority or act arbitrarily or capriciously by holding a de novo hearing and issuing a de novo decision and that its decision should have been affirmed. At the time of Maurer's first CSB hearing, the CSB had no hearing rules or procedures for handling an appeal from a sheriff's dismissal of a deputy.

The question is: When the CSB has no hearing rules or procedures, what standard of review should the CSB apply when reviewing a sheriff's dismissal of a deputy?

In *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 266-67, 62 P.3d 247 (2003), our Supreme Court stated:

"K.S.A. 19-805(a) demonstrates the legislature's intent to vest sheriffs, not boards of county commissioners, with the authority to 'appoint, promote, demote and dismiss additional deputies and assistants.'

. . . .

". . . While personnel actions taken by sheriffs are 'subject to' personnel policies, payment plans, collective bargaining agreements, and budgets established by boards of county commissioners, K.S.A. 19-805(d) does not give county commissioners the ability to supersede a sheriff's power to appoint, promote, demote, or dismiss his or her personnel."

Under K.S.A. 19-805(d), personnel actions taken by a sheriff are subject to an applicable civil service system. When a county civil service board has no hearing rules and procedures, an appeal from a sheriff's personnel action is controlled by K.S.A. 19-4303 *et seq.* "The sheriff may dismiss any permanent employee when he considers that the good of the service will be served thereby;" however, the sheriff is restricted from dismissing a permanent employee for "political, religious or racial reasons." K.S.A. 19-4327(a).

We recognize that the CSB is a quasi-judicial body that has the authority to "[c]onduct hearings and hear complaints" by or against personnel of the sheriff's department. K.S.A. 19-4311(h). It is "empowered to 'investigate facts, weigh evidence, draw conclusions as a basis for official actions, and exercise discretion of a judicial nature.'" *Ratley v. Sheriff's Civil Service Board*, 7 Kan. App. 2d 638, 641, 646 P.2d 1133 (1982). In making its decision, the CSB should

take into consideration that "[t]he sheriff may dismiss any permanent employee when he considers that the good of the service will be served thereby." K.S.A. 19-4327(a). After a hearing and consideration of the evidence, the CSB has the authority to approve or disapprove the sheriff's decision. K.S.A. 19-4327(d). However, the CSB is limited to considering "the reasonableness" of the sheriff's action. K.S.A. 19-4327(b).

Maurer cites *Zoellner v. Civil Service Bd. of Leavenworth County*, 39 Kan. App. 2d 693, 182 P.3d 1288 (2008), claiming that the CSB is "statutorily authorized by making a determination on the reasonableness of the Sheriff's decision." He then makes a huge leap and concludes that using this "reasonable" standard, "the first CSB did not exceed its authority and did not act arbitrarily and capriciously by holding a de novo hearing and issuing a de novo decision." He cites no authority for his conclusion.

The issue in *Zoellner* was whether a county civil service board had the authority to transfer a dismissed sheriff's deputy to another law enforcement agency. A panel of this court held that after the civil service board sustained the dismissal of the deputy, it did not have the authority to require the sheriff to rehire him. *Zoellner*, 39 Kan. App. 2d at 698.

The dissent claims that this "civil-service board concluded that firing Maurer wasn't reasonable." 46 Kan. App. 2d at 710 (Leben, J., dissenting). We note that the words "reasonable" or "reasonableness" do not appear in either the oral or written CSB decisions from the 2008 hearing.

The CSB's order found:

1. "No evidence to support the finding that a violation of LL occurred."

2. "[T]he two reports were, by all accounts, truthful."

3. "The mere fact that the first report was not as complete as desired does not rise to a violation of LL."

4. "Mr. Maurer at all times took responsibility."

It is obvious that the CSB did not consider all of the exhibits and evidence as it alleged. During Maurer's questioning by Captain Rector, he repeatedly said, "I didn't wanna take full responsibility"; "I should've came forth and gave 'em a complete story but I did

not think it was uh that bit of a deal because it was just a simple uh, a windshield and I didn't feel comfortable jumpin' up and down saying I broke the windshield." The glaring omissions in all of Maurer's reports, including the last written report where he stated that he tried to kill the horsefly with a "blue smooth notebook (no binders)," was that he hit the windshield with was a "pookette" with metal corners.

Maurer's report of how the windshield was cracked goes from
- "Crack—rock in windshield," to
- "[T]he windshield had spiderwebbed as the result of a rock chip the previous day," to
- "[W]hen a small chip in the windshield grew into crack. I believe I must have aggravated the chip when I attempted to kill a Horse Fly," to finally
- "While driving down the highway, I attempted to kill a large horse fly" and "I grabbed the only thing I could find, which was a blue smooth notebook (no binders) and attempted to kill it. I believe that striking the windshield aggravated a previous rock chip that grew into a 'spider web.'"

All of Maurer's reports were calculated to shift responsibility from him. Maurer "didn't wanna take full responsibility" for what he had done. Maurer consistently states that all of his reports were true; however, when questioned, he admitted there was no "rock in windshield" the previous day. The facts of this case do not support the 2008 decision reached by the first CSB. The findings of the first CSB are not supported by the record.

The dissent would have this court blindly accept the first CSB decision as "true" along with "the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the [CSB]." 46 Kan. App. 2d at 713. The dissent would have us adopt a "relaxed standard" of review and "fill any gaps in the findings" and agree with the CSB that the "sheriff's decision to terminate Maurer was unreasonable." 46 Kan. App. 2d at 714, 716.

Maurer claims that the first CSB decision "was substantially supported by the evidence" because the CSB's decision found "no evidence to support the [sheriff's] finding that a violation of LL

occurred." Notwithstanding this assertion, Maurer argues that there only needs to be "**a** factual basis" to support the CSB's decision. He relies on *Davenport Pastures v. Board of Morris County Comm'rs*, 40 Kan. App. 2d 648, 659, 194 P.3d 1201 (2008), *rev'd* 291 Kan. 132, 238 P.3d 731 (2010), to support this statement. *Davenport* is distinguishable in all respects from Maurer's case. *Davenport* was an appeal from a district court order approving a Morris County Board of County Commissioners' award of damages. Importantly, *Davenport* does not involve a review of a sheriff's decision by a county civil service board. The case has no support for Maurer's assertion.

Maurer also claims that "Greenwood testified that the reports completed by Maurer were truthful." On redirect examination by the sheriff's counsel, Greenwood was asked:

"Q. Sergeant, Policy LL on truthfulness says, 'Employees are prohibited from failing to disclose information in connection with the performance of their duties.' Did Mike Maurer fail to disclose information to you?

"A. Yes.

"Q. And when did he do that?

"A. When he came in and verbally offered untruthful information to me.

"Q. So he didn't tell you the truth about how the windshield got cracked—

"A. That's correct.

"Q. —verbally. And then in his first report 4A, he didn't tell you the truth there either, did he?

"A. *He omitted part of what happened.*" (Emphasis added.)

On prior cross-examination by Maurer's counsel, Greenwood was asked:

"Q. So where is the untruthfulness then in Exhibit 4 [Maurer's second written report]?

"A. It's not in Exhibit 4.

"Q. Okay. Where is the untruthfulness in Exhibit 4A [Maurer's first written report]?

"A. *Other than lack of information* it's not untruthful there either." (Emphasis added.)

Contrary to the PSB's and the sheriff's determination, Maurer argues that submitting a report that is "not as complete as desired" is not a violation of the truthfulness policy. He claims that "officers frequently amend reports to add information and are not consid-

ered dishonest." Maurer has cited no specific instance where an officer had been required to file a second report because the officer omitted critical facts from a prior report. Reference to unspecified amended reports without facts does not support Maurer's position. Such an assertion is without merit.

Maurer's "not as complete as desired" report was a half truth. When Greenwood asked Maurer to prepare the first written report, Greenwood wanted "Maurer to come forward on his own and explain exactly what occurred . . . to explain truthfully exactly what happened." Maurer's first verbal and written explanations of the cause of the windshield crack were half truths. The reason that Maurer gave for the half truth was that he did not want to "claim sole responsibility." Half truths are untruths if they infer a conclusion different from what would have been concluded had the whole truth been told. See *Johnstone v. Cronlund*, 25 F.R.D. 42, 45 (E.D. Pa. 1960). Maurer's half truth was calculated to produce a different conclusion than the conclusion that would have been drawn had the whole truth been told.

Our Supreme Court has held that an abuse of discretion occurs when the action taken is arbitrary, fanciful, unreasonable, or not supported by the facts. *Pork Motel, Corp. v. Kansas Dept. of Health & Environment*, 234 Kan. 374, 381, 673 P.2d 1126 (1983). An agency's decision is arbitrary and capricious if it is "is so wide of the mark that its unreasonableness lies outside the realm of fair debate." *In re Tax Application of Emporia Motors, Inc.*, 30 Kan. App. 2d 621, 624, 44 P.3d 1280, *rev. denied* 274 Kan. 1112 (2002). An agency's action is arbitrary and capricious if it is unreasonable, without foundation in fact, not supported by substantial evidence, or without adequate determining principles. See K.S.A. 77-621(c)(8); *Dillon Stores v. Board of Sedgwick County Comm'rs*, 259 Kan. 295, 300-01, 912 P.2d 170 (1996); *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 474-75, 749 P.2d 21 (1988); *Dallinga v. Center Township*, 19 Kan. App. 2d 482, 484, 871 P.2d 1293, *rev. denied* 255 Kan. 1000 (1994).

Although the first CSB may have concluded that the sheriff's decision was harsh or severe, that is not the standard of review applicable to a sheriff's decision to dismiss a deputy. When a county

civil service board holds a hearing and has no operating rules and procedures, its review is limited to determining whether there was substantial evidence to support the sheriff's termination of a deputy. Here, there was substantial evidence to support the sheriff's dismissal of Maurer. The first CSB's findings of fact stated in its 2008 written decision are not supported by substantial evidence and are arbitrary. By concluding that there was no evidence to support a violation of the sheriff's truthfulness policy, the CSB abused its discretion.

The first CSB erred in reversing the sheriff's decision.

*District Court's Review of the First CSB Decision*

Preliminarily, we note that the first CSB decision was not a unanimous decision. Also, the CSB erred when it stated that its decision is reviewable under the Kansas Administrative Procedure Act (KAPA), K.S.A. 77-501 *et seq.*, and the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.* K.S.A. 77-501 *et seq.* and K.S.A. 77-601 *et seq.* are only applicable to state agencies decisions. Under *O'Hair v. U.S.D. No. 300*, 15 Kan. App. 2d 52, 56, 805 P.2d 40, *rev. denied* 247 Kan. 705 (1990), this court held that a state agency is

"any officer, department, bureau, division, board, authority, agency, commission or institution of this state which is authorized by law to administer, enforce or interpret any law of this state but *does not include any political or taxing subdivision of the state, or any agency thereof,* or the judicial or legislative branch of state government."

Because the CSB is a subdivision of the County—which is a political and taxing subdivision of the state, the CSB is not a state agency and therefore its decision is not reviewable under the KAPA. The district court held that the CSB is a quasi-judicial entity of a political subdivision. A judgment or final order of a political or taxing subdivision exercising judicial or quasi-judicial function may be reversed, vacated, or modified by the district court on appeal, and the district court may enter judgment as justice shall require under K.S.A. 60-2101(d).

Our Supreme Court in *Kansas State Board of Education v. Marsh*, 274 Kan. 245, 255, 50 P.3d 9 (2002), stated:

"K.S.A. 60-2101(d) provides: 'A judgment rendered or final order made by a political or taxing subdivision, or any agency thereof exercising judicial or quasi-judicial functions may be reversed vacated or modified by the district court on appeal.' No standard of review for district courts is specified by statute."

When the scope of review is governed by K.S.A. 60-2101(d) and not the KAPA, our court has held: " 'The district court may not hear the case de novo, but is limited to deciding whether: (1) The Board's decision was within the scope of its authority; (2) its decision was substantially supported by the evidence; and (3) it did not act fraudulently, arbitrarily, or capriciously.' " *O'Hair*, 15 Kan. App. 2d at 57 (quoting *Butler v. U.S.D. No. 40*, 244 Kan. 458, 463, 769 P.2d 651 [1989]).

The dissent suggests that Kansas has "long applied a rule when reviewing administrative-agency decisions to see if they are supported by substantial evidence; in such cases, we look only at the evidence supporting the agency's findings and ignore contrary evidence." 46 Kan. App. 2d at 713. For support, the dissent cites *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 263, 75 P.3d 226 (2003), *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 962, 811 P.2d 876 (1991), *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 496-97, 961 P.2d 696 (1998), *Southern Star Central Gas Pipeline, Inc. v. Cunning*, 37 Kan. App. 2d 807, Syl. ¶ 1, 157 P.3d 1120 (2007), and *Kansas State Board of Education*, 274 Kan. at 256.

The *Garvey Elevators* and *Southern Star* cases articulated the standard for an appellate court's review of a district court's decision. That standard is not applicable to a review of a CSB decision by a district court. *Kaufman* involved the Kansas Human Rights Commission—and the standard of review was an appellate court's review of a district court's decision. *Marsh* is a teacher termination case and is not controlled by the same statutes as civil service boards that review a sheriff's personnel decision.

The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *Bergstrom v. Spears Manufacturing Co.*, 289 Kan. 605, 607, 214 P.3d 676 (2009). When a statute is plain and unambiguous, the court will not read into the statute something not readily found in it.

*Double M. Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271, 202 P.3d 7 (2009). To the extent any statutory interpretation is required, appellate review is unlimited and deference is no longer given to the agency's interpretation. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2008).

A decision of the CSB, a quasi-judicial board, may be reversed if it acted outside its scope of authority, made a decision not supported by substantial evidence, or acted fraudulently, arbitrarily, or capriciously as the dissent has articulated. See *Robinson v. City of Wichita Retirement Bd. of Trustees*, 291 Kan. 266, 270, 241 P.3d 15 (2010). The district court reviewing the CSB decision held:

"[T]he CSB acted outside of its scope of authority and acted arbitrarily and capriciously. The CSB, instead of making a determination of substantial and competent evidence, substituted its judgment for the decision of the Sheriff in order to secure an alternate outcome. In doing so, the CSB reweighed the evidence and determined that there was some evidence to support Maurer and none to support the Sheriff's action. However, there exists a deferential standard with regard to the CSB's review of the Sheriff's personnel decisions regarding his Deputies and standards for truthfulness and for the good of the service. The CSB's duty is to determine whether there was substantial and competent evidence to support the Sheriff's decision. The CSB employed an erroneous standard of review of the Sheriff's decision. Additionally, the failure of the CSB to enact rules and procedures to give effect to the provisions of the act resulted in the CSB acting arbitrarily and capriciously in overturning the Sheriff's decision to terminate Maurer.

"The case is remanded to the CSB for further consideration under the appropriate legal standard and under rules and procedures adopted to give meaning and effect to the hearing that is authorized by K.S.A. 19-4327."

We agree that the CSB's first decision was not supported by substantial competent evidence, and the district court did not err in reversing that decision.

### ADOPTION OF HEARING RULES AND PROCEDURES

Maurer claims that the district court erred in its 2009 decision because the "first CSB did not exceed its authority or act arbitrarily and capriciously by not establishing rules for the hearing, and, if it did, it amounts to harmless error."

K.S.A. 19-4327(e) requires the CSB to establish such rules as may be necessary. The district court determined that the CSB acted arbitrarily by not adopting hearing rules prior to Maurer's

first hearing. "In this court's view," the district court held, "the failure to provide such standards for operation created an environment where the parties were unaware of the procedural and substantive rules guiding the CSB. Moreover, not only did the CSB fail to communicate such rules to the parties, the board failed to enact them." Denning agrees that the CSB had "a clear directive from the legislature" to create hearing rules under K.S.A. 19-4327(e).

Maurer focuses on the "as may be necessary" language, arguing that the statute "leaves it up to the CSB to decide whether rules are necessary to carry out its duties" and that "rules may not be necessary at all." See K.S.A. 19-4327(e).

Neither party has offered legal support for its interpretation of the statute or the rule-making requirement. The district court cited *Hallmark Cards, Inc. v. Kansas Dept. of Commerce & Housing*, 32 Kan. App. 2d 715, 726, 88 P.3d 250, *rev. denied* 278 Kan. 844 (2004), which stated the statute "explicitly directed that the Department" publish rules and regulations. The court noted that "failure to promulgate regulations specifying comprehensive and complete standards coupled with an application of informal standards on a case-by-case basis" may render the agency's decision arbitrary and capricious, and otherwise not in accordance with the law. 32 Kan. App. 2d at 726. "Given this clear legislative mandate, we must hold the Department to an even higher level of scrutiny in determining whether its internal and unwritten standards have been consistently and uniformly applied." 32 Kan. App. 2d at 726. We do not have such a clear directive in this case.

As Denning argues, appearing before this quasi-judicial body without an applicable standard is "patently unfair to those appearing before it." Maurer claims that so long as " 'the agency error did not prejudice the parties, the agency's action must be affirmed.' " See *Farmland Industries, Inc. v. Kansas Corp. Comm'n*, 25 Kan. App. 2d 849, 852, 971 P.2d 1213 (1999) (citing *Zinke*, 242 Kan. at 475). Maurer claims: "In viewing the records, it is clear that the lack of established rules did not cause actual harm to any party." Denning argues he was not "able to prepare ahead of time for the type of hearing to be conducted."

We have determined that it is not possible to conclude that the CSB's failure to establish rules was harmless given the casual approach the first CSB used during the hearing and the issuance of a decision within minutes after the hearing ended.

Here, the district court found that the "failure to provide such standards for operation created an environment where the parties were unaware of the procedural and substantive rules guiding the CSB." K.S.A. 19-4327(e) requires a county civil service board to establish such rules as may be necessary. However, the failure to provide rules and regulations while holding a fairly informal hearing creates an environment that allows a civil service board to operate on a case-by-case basis. A case-by-case hearing does not promote consistency or uniformity in hearings and decisions. The failure of a civil service board to enact rules and regulations for its hearing procedures and orders creates an inference that its decision was arbitrary and capricious.

The dissent correctly states that this issue was not raised before the district court and issues not raised before the district court cannot generally be raised on appeal. Slip op. at 38. However, courts recognize three exceptions to this general rule and grant review if: "(1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; or (3) the judgment of the district court may be upheld on appeal despite its reliance on the wrong ground." *State v. Shopteese*, 283 Kan. 331, 339, 153 P.3d 1208 (2007).

The protection of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution extends to quasi-judicial administrative proceedings. *Davenport Pastures v. Board of Morris County Comm'rs*, 291 Kan. 132, 139, 144-46, 238 P.3d 731 (2010). Here, the CSB engaged in a quasi-judicial proceeding. Therefore, "it is incumbent upon the authority to comply with the requirements of due process in its proceedings. Thus, the proceedings must be fair, open, and impartial. A denial of due process renders the resulting decision void." *McPherson Landfill,*

*Inc. v. Board of Shawnee County Comm'rs*, 274 Kan. 303, 305, 49 P.3d 522 (2002).

Our Supreme Court has also defined the essential elements of due process as "notice and a meaningful opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case." *Kansas Dept. of Revenue v. Coca Cola Co.*, 240 Kan. 548, 551, 731 P.2d 273 (1987).

Maurer's argument that the district court erred in its 2009 decision because the "first CSB did not exceed its authority or act arbitrarily and capriciously by not establishing rules for the hearing, and, if it did, it amounts to harmless error" implicates due process rights. Therefore, this court may address the issue for the first time on appeal. Whether a right to due process has been violated is a question of law over which this court exercises unlimited review. *State v. Holt*, 285 Kan. 760, 774, 175 P.3d 239 (2008).

Before the first CSB hearing began, the chairperson stated that the hearing would be "fairly informal," and yet the CSB heard extensive testimony and arguments. Such a statement did not give either party any directive on the procedural or substantive rules that the CSB would follow, and it was error not to provide rules and procedures for its hearing and decision.

APPLICATION OF NEW CIVIL SERVICE RULES ON REMAND

Maurer claims the adoption of the Charter Resolution deprived him of due process rights at the second CSB hearing. Between the first and second CSB hearings, the Board enacted the Charter Resolution which is "the first, and to date only, set of rules and regulations applicable to the CSB's quasi-judicial disciplinary review function." As long as the employee is given a full and fair hearing, the CSB's review is limited to whether the sheriff's decision "is supported by adequate evidence in the record and is not clearly unreasonable." Charter Resolution, Article VIII, sec. 4. Further, the CSB "shall give deference to the Sheriff's Office and shall not substitute its judgment for that of the Sheriff and will overturn the decision of the Sheriff only when no evidence in the record supports the decision." Charter Resolution, Article VIII, sec. 6.

According to Maurer, this Charter Resolution should not apply to his second CSB hearing because it was enacted after his original hearing was held. Administrative regulations have the force and effect of statutes and will be construed to operate prospectively unless a contrary intent is clearly indicated. *Tonge v. Werholtz*, 279 Kan. 481, 486, 109 P.3d 1140 (2005). But there is an exception to the general rule where the change is procedural or remedial in nature. *In re Tax Appeal of Alsop Sand Co., Inc.*, 265 Kan. 510, 523-24, 962 P.2d 435 (1998).

Procedural laws deal with " 'the manner and order of conducting suits—in other words, the mode of proceeding to enforce legal rights.' [Citation omitted.]" *Rios v. Board of Public Utilities of Kansas City*, 256 Kan. 184, 191, 883 P.2d 1177 (1994). "Substantive laws establish the 'rights and duties of parties.' [Citation omitted.]" 256 Kan. at 191.

Maurer argues the Charter Resolution "significantly changes the hearings conducted by the CSB" and therefore is substantive. The CSB counters that the standard of review "used by a review board is a procedural matter that may be applied retroactively."

Maurer has not persuasively or substantially argued that the Charter Resolution is a substantive change. As the CSB points out, Maurer has not clearly identified which of his vested or substantive rights have been affected by the Charter Resolution. Maurer did not have a vested right in the procedure used in this case. See *Nitchals v. Williams*, 225 Kan. 285, 291, 590 P.2d 582 (1979).

Maurer has a right to be heard fully before being terminated and that right has not been affected by the Charter Resolution. Under the Charter Resolution, the CSB must still determine whether Maurer was afforded a "full and fair opportunity" to address the issues before determining if the sheriff's decision is supported by adequate evidence.

The CSB points this court to a Texas decision where the criminal appeals court held that the procedural mechanisms for reviewing a conviction are not a vested and substantive right. *Fowler v. State*, 991 S.W.2d 258, 261 (Tex. Crim. App. 1999). This criminal case offers no support for CSB's position.

In *Johnson Co. Developmental Supports v. Kansas Dept. of SRS*, 42 Kan. App. 2d 570, 577-78, 216 P.3d 658 (2009), this court applied the new standard of review on appeal even though the review statute had been changed after the administrative proceedings were completed. "When a statute is amended while an appeal is pending, and counsel for both sides have had an opportunity to brief and argue the amended statute, the appellate court will consider and construe the amended version of the statute." *State ex rel. Secretary of SRS v. Bohrer*, 286 Kan. 898, 904, 189 P.3d 1157 (2008).

The Charter Resolution established procedural rules and could be applied to cases pending as of the effective date of its adoption. We find that the Charter Resolution was properly applied in the second CSB hearing.

## SECOND CIVIL SERVICE BOARD DECISION

Finally, Maurer briefly argues that the second CSB's decision was not supported by substantial evidence and should be reversed. Maurer contends that, "if anything, [the] reports were incomplete—not untruthful." But, as discussed above, leaving out critical facts is a violation of the department's truthfulness policy. Therefore, even under Maurer's argument, there is evidence to support the CSB's decision. See *Jones v. Kansas State University*, 279 Kan. 128, 142-43, 106 P.3d 10 (2005).

Maurer states that the difference in outcomes between the two CSB decisions "demonstrates that the second decision was arbitrary and capricious." But as the CSB points out, "reaching different conclusions under different standards of review is not an indication of arbitrary action." Inconsistency between decisions is not reversible error so long as the decision is supported by substantial evidence. See *State v. Herron*, 286 Kan. 959, 966, 189 P.3d 1173 (2008).

There was substantial evidence to support a finding that Maurer violated the sheriff's truthfulness policy. Therefore, the district court's decisions of January 8, 2009, and March 30, 2010, are affirmed.

Affirmed.

* * *

LEBEN, J., dissenting: Johnson County Sheriff Frank Denning fired Deputy Michael Maurer after Maurer failed initially to report that he'd caused a crack in the windshield of a patrol car by tossing a 5-pound plastic accordion folder full of papers at a horsefly in the car. But Kansas law makes the sheriff's personnel decision subject to review by a civil-service board "to determine the reasonableness of [the] action." K.S.A. 19-4327(b). The civil-service board concluded that firing Maurer wasn't reasonable, and we are not allowed to substitute our judgment for that of the administrative agency charged by statute with making such a decision. I would therefore affirm the decision of the civil-service board, which ordered that Maurer be reinstated.

The procedural history of this case is a bit complicated, and we should begin with consideration of that. There were two civil-service board hearings in this case because the district court vacated the first civil-service-board order, which had voted 3 to 1 to require Maurer's reinstatement. A second civil-service-board hearing, which took place after the Johnson County Commission adopted new rules to guide the process, resulted in a 3-to-2 decision upholding the sheriff's action.

From a procedural standpoint, one other complicating factor is the sheriff's use of what he calls a professional-standards board as part of his department's internal process of deciding whether to take disciplinary action against or terminate an employee. While the sheriff is free to consult with others in making employment-related decisions, the professional-standards board is not established by statute, and its existence does not change the statutory authority of the civil-service board.

In my view, the district court wrongly vacated the first civil-service-board order. Because the case should have ended with an affirmance of that order reinstating Maurer, I do not address any issues relating to the second board hearing.

### THE ROLES OF THE SHERIFF AND THE CIVIL-SERVICE BOARD IN FIRING DECISIONS

Consideration of the case must begin with delineation of the

respective roles of the sheriff and the civil-service board in a civil-service system. Such systems are designed to protect permanent employees from being fired unfairly. For an urban sheriff in Kansas, the sheriff may dismiss a permanent employee "when he considers that the good of the service will be served thereby," but may never dismiss an employee for political, religious, or racial reasons. K.S.A. 19-4327(a). But the employee has a further protection: "Any employee so dismissed may request . . . a hearing before the [civil-service] board to determine the reasonableness of such action." K.S.A. 19-4327(b). In addition, K.S.A. 19-805(d) provides that "[a]ny personnel action taken by the sheriff . . . shall be *subject to* . . . any applicable . . . civil service system [emphasis added]," and "subject to" generally means subordinate, subservient, or inferior to. See Black's Law Dictionary 1425 (6th ed. 1990); *Franks v. Roades*, 310 S.W.3d 615, 629 (Tex. App. 2010).

So the sheriff may make whatever initial decision the sheriff finds appropriate for the good of the sheriff's department, but the civil-service board must determine, on appeal by the employee, the reasonableness of the sheriff's action. After all, the civil-service board hearing has only one statutory purpose: "to determine the reasonableness of such action." K.S.A. 19-4327(b). And when the civil-service board finds the sheriff's decision unreasonable and disapproves the decision, it "shall order the reinstatement of the employee." K.S.A. 19-4327(c).

In this system, as established by statute, the civil-service board exercises quasi-judicial functions. *Ratley v. Sheriff's Civil Service Board*, 7 Kan. App. 2d 638, Syl. ¶ 5, 646 P.2d 1133 (1982); see also *Umbehr v. Board of Wabaunsee County Comm'rs*, 252 Kan. 30, 33, 843 P.2d 176 (1992) (action taken by agency or board that determines legal issues as they stand on present facts and existing law is either judicial or quasi-judicial in nature); *Halford v. City of Topeka*, 234 Kan. 934, 936, 677 P.2d 975 (1984) (finding jurisdiction to hear police officer's appeal of civil-service board ruling under provision allowing appeal from quasi-judicial decisions); *Adams v. Marshall*, 212 Kan. 595, 599, 512 P.2d 365 (1973) (city's civil-service commission reviewing police-officer disciplinary actions acts in quasi-judicial capacity); *Thompson v. Amis*, 208 Kan. 658,

663, 493 P.2d 1259, *cert. denied* 409 U.S. 847 (1972) (state civil-service board acts in quasi-judicial capacity). That means that the civil-service board is the entity designated by statute in these cases to investigate the facts, weigh the evidence, draw conclusions, and exercise any discretion that's of a judicial nature. *Ratley*, 7 Kan. App. 2d 638, Syl. ¶ 4.

## THE COURT'S STANDARD OF REVIEW FOR A LOCAL GOVERNMENT'S CIVIL-SERVICE BOARD

When a city or county board acts in a quasi-judicial capacity, that board—not a reviewing court—is charged with making the factual findings and exercising whatever discretion there is. Accordingly, court review is highly deferential. We may reverse the board's decision only if it acted outside its scope of authority, made a decision not supported by substantial evidence, or acted fraudulently, arbitrarily, or capriciously. *Robinson v. City of Wichita Retirement Bd. of Trustees*, 291 Kan. 266, 270, 241 P.3d 15 (2010); *Brown v. U.S.D. No. 333*, 261 Kan. 134, 138, 928 P.2d 57 (1996). In this review, the court must not substitute its judgment for that of the quasi-judicial board, nor may the court consider the facts independently and make its own findings. *Neeley v. Board of Trustees, Policemen's & Firemen's Retirement System*, 205 Kan. 780, 782-83, 473 P.2d 72 (1970). The same standards are applied whether review is in the district court or in an appellate court. *Robinson*, 291 Kan. at 270.

There are some additional rules that apply to a court review of the civil-service board's decision here. Before discussing them, I note that the Kansas Judicial Review Act, adopted in 1984, does not apply to the review of decisions made by local units of government. See K.S.A. 77-602(a); K.S.A. 77-603(a); *Frick v. City of Salina*, 289 Kan. 1, 10-11, 208 P.3d 739 (2009). So when a court reviews the ruling of a county's civil-service board, we apply the traditional rules Kansas courts have applied when reviewing local-agency actions without regard to the statutory changes that have been enacted for our review of state-agency decisions. Although the legislature adopted new standards for review of state-agency decisions in 1984 and has made a number of amendments to those

statutes since then, it has not made similar changes to the caselaw standards that had been in place for review of local-government actions.

Kansas has long applied a rule when reviewing administrative-agency decisions to see whether they are supported by substantial evidence; in such cases, we look only at the evidence supporting the agency's findings and ignore contrary evidence. *E.g., Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 263, 75 P.3d 226 (2003) ("[T]he courts must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the agency. They are to disregard any conflicting evidence or other inferences which might be drawn therefrom."); *Connelly v. Kansas Highway Patrol*, 271 Kan. 944, 965, 26 P.3d 1246 (2001) ("The appellate court must accept as true the evidence and all inferences to be drawn therefrom which support or tend to support the findings of the factfinder. We are to disregard any conflicting evidence or other inferences."); *Kaufman v. Kansas Dept. of SRS*, 248 Kan. 951, 962, 811 P.2d 876 (1991) ("The court is not concerned with evidence contrary to the findings but must focus solely on evidence in support of the findings."). That same rule is applied when a court reviews the factual findings of a district judge hearing evidence without a jury. See *Garvey Elevators, Inc. v. Kansas Human Rights Comm'n*, 265 Kan. 484, 496-97, 961 P.2d 696 (1998); *Southern Star Central Gas Pipeline, Inc. v. Cunning*, 37 Kan. App. 2d 807, Syl. ¶ 1, 157 P.3d 1120 (2007). When an agency acts in a quasi-judicial capacity, it plays a hybrid role as both an administrative agency and as the entity performing a judicial function. On judicial review, we have traditionally applied the same rules—looking only at the evidence supporting the factual finding—both to review of agency factual findings and to review of the findings of a district judge to see whether substantial evidence supports those findings. When an agency, board, or hearing committee plays a hybrid, quasi-judicial role, we continue to apply those same rules. See *Kansas Board of Education v. Marsh*, 274 Kan. 245, 256, 259, 50 P.3d 9 (2002).

One more aspect of court review must be noted. Generally, unless required by a statute (like the Kansas Administrative Proce-

dures Act now provides for state agencies in K.S.A. 77-526), agencies, boards, or hearing commissions are not required to make any detailed findings to support their rulings. *E.g., Kansas Racing Management, Inc. v. Kansas Racing Comm'n*, 244 Kan. 343, 366, 770 P.2d 423 (1989) ("Specific findings of fact by an administrative agency, while desirable in contested matters, are not indispensable to a valid decision in the absence of a statute or rule requiring them."). Even when a statute has a general findings requirement, Kansas courts have applied a relaxed standard on review under which the court may fill any gaps in the findings by reference to supporting evidence in the record. See *In re Tax Appeal of Horizon Tele-Communications, Inc.*, 241 Kan. 193, 196-97, 734 P.2d 1168 (1987). When we review the decision of a district judge, we generally presume that the district court found all of the facts needed to support its judgment unless a party objected in the district court to the findings as inadequate. *E.g., Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006). I presume that the same rule applies when we review the ruling of an administrative body acting in a quasi-judicial manner.

CONSIDERATION OF THE FIRST CIVIL-SERVICE BOARD RULING

With these rules in mind, let's consider what happened in the first civil-service-board hearing. The board recognized in its order that it agreed with Maurer that the board was acting in a quasi-judicial capacity, rejecting the sheriff's argument that the board's role was limited to determining whether the sheriff had provided procedural due process before terminating Maurer. The board decided against the sheriff's claim that Maurer violated the department's truthfulness policy by omitting important information from his initial report. The board's order explicitly made these factual findings:

- "[T]here was no evidence to support the finding that a violation of [Professional Standard LL, Truthfulness] occurred."
- "[T]he two reports [Maurer submitted] were, by all accounts, truthful. See testimony of Sergeant [Joseph] Greenwood[, who asked Maurer to provide written reports.]"

- "In response to questions from counsel, Greenwood concedes that the reports were truthful, the only issue was that [Maurer] was 'not as specific as [Greenwood] or Lieutenant [Robert] Pinkelman wanted him to be.' "
- "[Maurer's] only error was to fail to include in the first report that the item he tossed at the horsefly was a blue folder."
- "[Maurer's] immediate supervisor, Sergeant Greg Shelton, believes Maurer does a good job; shows up for work; knows and does what needs to be done and is reliable and truthful. He would like to have him back as an officer."

Based on these findings, the board ordered Maurer reinstated.

When we review these findings to determine whether they are supported by substantial evidence, we must look only at the evidence supporting them. Even so, I would agree with the majority that there's a real question here as to whether the board's finding that there was no violation of the sheriff's truthfulness rules took place. But the ultimate factual question before the board was whether the sheriff's decision to terminate Maurer (for violating that policy standard) was reasonable, not whether there was a violation at all.

The majority concludes that the civil-service board made no explicit conclusion that firing Maurer wasn't reasonable, apparently because it did not use those terms in its order. But that's far too strict an interpretation of the board's ruling under our standards of review. Boiled down, it's clear that the board didn't think it was reasonable to fire a 17-year department veteran for failing initially to report his role in causing a crack in the windshield when he tossed a vinyl folder at a horsefly.

Here, the ultimate question before the civil-service board was the reasonableness of the sheriff's decision. Denning appealed to the district court on the basis that the board had wrongly substituted its own judgment for that of Denning. But that's exactly what the board is authorized by statute to do: The board is authorized to make a determination of reasonableness, a standard that necessarily implies the application of discretion. Moreover, under *Ratley* and the other cases I've cited, it's clear that the board was acting

in a quasi-judicial capacity, and it's the quasi-judicial entity that exercises whatever discretion is present that's of a judicial nature.

We also must decide whether the determination of reasonableness is a factual issue or a legal one. In a great many contexts, Kansas courts have held that the determination of reasonableness is a factual question to be resolved by the trier of facts, not by the court. *E.g., Dreiling v. Davis*, 38 Kan. App. 2d 997, 1003, 176 P.3d 197 (2008) ("Generally, reasonableness is a fact question."). If the reasonableness issue is a factual question, as appears to be the case, we must again give great deference to the board's finding. But even if the reasonableness issue here is more like a legal issue than a factual one, the entity that is to exercise whatever judicial discretion exists is the civil-service board, not the sheriff, the district court, or an appellate court.

The majority's view differs from mine in part because it concludes that the first civil-service board's findings are not supported by substantial evidence. The majority may be right with respect to the board's finding that Maurer didn't violate the sheriff's policy on truthfulness. While Sergeant Greenwood did testify that he found nothing untruthful in Maurer's two written reports, Greenwood—and the majority—rightly criticize Maurer for what he omitted. But that doesn't resolve this case because the board's ultimate finding was that the sheriff's decision to terminate Maurer was unreasonable. And there's substantial evidence to support that decision.

Another traditional rule applied when reviewing agency decisions in Kansas underscores that point—the findings and conclusions of such entities are not to be disturbed by a reviewing court unless they are "so wide of the mark as to be outside the realm of fair debate." *Kaufman*, 248 Kan. at 961; *Central Kansas Power Co. v. State Corporation Commission*, 206 Kan. 670, 675, 482 P.2d 1 (1971). The board's conclusion that Maurer should not have been fired—when we limit our review to the facts supporting that conclusion—surely is not outside the realm of fair debate.

Let's consider some additional facts supporting the board's conclusion on this point. Maurer is a veteran of the United States Marine Corps, in which he served 6 years on active duty. At the

time of his firing, Maurer continued to serve in the Marine Corps reserves; he had been a reserve for 17 years. He had also been a sheriff's deputy for 17 years. Maurer's direct supervisor, Sergeant Greg Shelton, said he considered Maurer a good officer and that he'd take him back. Lieutenant Pinkelman, a higher-level supervisor, agreed that Maurer was "an acceptable officer." In 17 years, Maurer had had only one relatively minor disciplinary issue: he had called the receptionist at a doctor's office "sweetheart," apparently when Maurer had brought an inmate there, and Maurer was told not to do anything like that again.

After providing good service in the sheriff's department for 17 years, Maurer tossed a vinyl plastic accordion folder (with metal edges only on part of the front flap) at the inside of a patrol car windshield in an attempt to kill a horsefly. The other officer who was present, Deputy Darrin Eddy, wrote in his reports that Maurer hadn't thrown it very hard, and he testified that it was not thrown "in an aggressive manner." Afterwards, Maurer and Eddy noticed a 2- to 3-inch crack in the windshield. Although they had not noticed a chip in the windshield beforehand, Maurer believed that there must have been a preexisting chip caused by a rock at that location before he tossed the notebook. Most of the department's vehicles have rock chips because of the number of miles they're driven, and the department generally doesn't repair them until a crack begins to form.

Maurer initially left a note for a supervisor merely indicating that the windshield had a crack in it. The note, attached to the car keys, said "crack in windshield," and above that it said "—rock." Pinkelman said that there weren't any written policies at that time about reporting damage to a vehicle but that "something to notify the sergeant that there is damage to the vehicle so the car won't be sent out with another officer on the following day" would be appropriate. Pinkelman said that the initial note provided that information. Greenwood asked Maurer to prepare a written report, and Maurer prepared one that said he had tried to kill a horsefly and that this had apparently aggravated an existing chip in the windshield. Pinkelman asked for a second report because Maurer had not said that he had used a specific object in the attempt to kill the

horsefly. Maurer wrote a second report, saying that he had taken a "blue smooth notebook" and attempted to kill the horsefly with it. He explained the damage by saying, "I believe that striking the windshield aggravated a previous rock chip that grew into a 'spider web.' " Pinkelman considered the second written report adequate.

If we are to stay true to the standard of review—under which we may look only at the evidence that supports the board's decision—we must also accept Maurer's view that there had to have been a preexisting rock chip in the windshield that expanded unexpectedly when hit with the large plastic folder. Eddy testified to the lack of force when Maurer tossed the folder at the horsefly, and Eddy said that the window likely was weakened, or the day was particularly hot, for the impact to have caused a crack in the windshield. The sheriff's department sent the windshield to its criminalistics laboratory for detailed analysis, and the examining scientist found "a chipped surface" on the exterior of the glass, which would be consistent with the rock-chip theory. But the examining scientist couldn't determine what that meant because in tests she found that a low-velocity projectile could cause damage from an impact to either side of a laminated-glass windshield. If there was a preexisting rock chip, though, Maurer's original note ("crack in windshield" and "—rock") seems more reasonable than if there was not.

Again, though, that's not the question we must answer. We must decide whether the board's decision—that it wasn't reasonable to fire 17-year-veteran Maurer for initially failing to disclose that he'd caused at least the exacerbation of a preexisting chip by tossing something at the windshield—was so wide of the mark as to be outside the realm of fair debate. K.S.A. 19-4327(b) leaves it within the discretion of the civil-service board to make the call. The board decided it wasn't reasonable to fire Maurer on these facts, a conclusion within the realm of fair debate, and we are required to uphold that decision.

The majority concludes that the civil-service board's role is somehow limited only to determining whether some evidence supports the sheriff's decision if the board has not adopted written operating rules and procedures. Nothing in K.S.A. 19-4327(b) sug-

gests that the board's role differs based on whether it has adopted such rules.

Reasonable people could disagree about whether it was reasonable to fire Maurer based on the facts as found by the civil-service board, and reasonable people could make different inferences than the board did from the evidence in this case. But a reviewing court does not reweigh the evidence or determine whether the evidence could have supported different findings; we look only to see whether there is sufficient evidence supporting the findings the board made. See *Kansas State Board of Education*, 274 Kan. at 259. Moreover, the legislature has by statute made the civil-service board a quasi-judicial entity, and the board therefore makes its own factual findings and is charged with exercising whatever discretion exists here. Reasonableness is a discretionary call, and the board makes it. On these facts, I believe that we must uphold its decision.

## OTHER ISSUES

In addition to the claim that the first civil-service-board decision wasn't supported by substantial evidence, Sheriff Denning has also contended that the board acted outside its authority, that it acted arbitrarily, and that its actions were tainted by a failure to adopt written procedures before the hearing. None of these arguments has merit.

The first objection—that the board acted outside its authority—is merely the sheriff's claim that the board was required to defer to his decision unless he had failed to provide a fair hearing to Maurer before dismissing him. In my view, that's simply wrong as a matter of law: K.S.A. 19-4327(b) gave the civil-service board the discretion to decide whether firing Maurer was reasonable, and K.S.A. 19-805(d) expressly made the sheriff's decision "subject to" the civil-service system.

The second objection—that the board acted arbitrarily and capriciously—is just another restatement of this same argument. The sheriff's claim is that the board "acted arbitrarily and capriciously by substituting its judgment for that of the Sheriff." The majority concludes that the board acted arbitrarily because it disregarded contrary evidence, but as I have already explained, there is sub-

stantial evidence to support the ultimate factual finding made by the board—that the sheriff's decision to fire Maurer in these circumstances was unreasonable.

The last objection—that the board didn't have written procedures in place for its hearing—was never made to the civil-service board and is therefore not properly raised here. See *Johnson v. Kansas Neurological Institute*, 240 Kan. 123, 126, 727 P.2d 912 (1986) (issues not raised in agency hearing generally may not be raised on appeal). While there are some limited exceptions to the requirement that an objection be raised in an administrative hearing, Denning has not argued any of those in his brief. Thus, we merely need to determine whether Denning made the objection that the board had no written procedures in place during the board's hearing.

Denning cites no place in the record where he made this objection before or at the first civil-service board hearing. Instead, he cites an affidavit he submitted to the district court in the appeal of that ruling, an affidavit in which the sheriff referenced attempts outside of any specific civil-service board hearing to have the County Commission change the rules for the civil-service board's work. In the affidavit, Denning said that he had "pointed out to the County Commissioners the [board's] lack of compliance with statutory requirements and confusion over the scope of review in disciplinary hearings," and that county legal staff were preparing proposed changes to the system. But presenting such an issue to county officials is not the same as making an objection during a contested quasi-judicial hearing: Deputy Maurer is a party in this proceeding but not a member of the County Commission. Nor has the sheriff identified any way in which a failure to have specific written procedures caused him any prejudice. The sheriff's affidavit makes clear that his conclusion about the "confusion over the scope of review in disciplinary hearings" relates not to procedural matters in general but specifically to whether the board has the discretionary call as to the reasonableness of a firing. The sheriff has consistently argued that the board's role is limited; in the affidavit, he said that "it [was] inappropriate for the [board] to override a termination decision unless they make a finding dismissal

was for political, religious or racial reasons." In my view, that's not the system the legislature has established.

It's true that K.S.A. 19-4327(e) says that a civil-service board "shall establish such rules as may be necessary to give effect to the provisions of the above section," under which it hears these dismissal appeals. No rules are needed to advise the sheriff that the civil-service board makes the reasonableness determination; that's established by statute. Sheriff Denning has not shown any confusion about any other matter, and Denning knew that Maurer contended that the civil-service board had the authority to make the reasonableness decision. Even on appeal, Denning has not identified any additional evidence that he would have presented had he operated under a proper interpretation of the board's authority. We should not hear his objection since it wasn't made to the civil-service board, and even if we were to consider it, the error was harmless because he hasn't shown any way in which he was prejudiced.

In sum, I conclude that the first civil-service board acted within its authority and that its decision that the sheriff's termination of Maurer wasn't reasonable is supported by substantial evidence. The district court therefore should have affirmed the first civil-service board ruling. Because the matter ends at that point, I do not address whether the County Commission has the authority by charter amendment to change the role of the civil-service board created by the legislature. I would also note that the parties have not addressed in their briefs whether the County's home-rule powers would allow it to limit the authority that K.S.A. 19-805(d) and K.S.A. 19-4327(b) otherwise give to the civil-service board. See K.S.A. 19-101a(14) (county may not use home-rule powers to exempt itself from or effect changes to K.S.A. 19-805); K.S.A. 19-805(d) ("Any personnel action taken by the sheriff . . . shall be subject to . . . any applicable . . . civil service system.").

I would reverse the district court and remand the case with directions to enter judgment affirming the first civil-service board order.