NOT DESIGNATED FOR PUBLICATION

No. 119,984

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JEFFREY L. LUPER,
*Appellee*,

v.

BOARD OF TRUSTEES OF THE
POLICE & FIRE RETIREMENT SYSTEM
OF WICHITA, KANSAS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JEFFREY E. GOERING, judge. Opinion filed August 23, 2019. Affirmed.

*Brian K. McLeod*, deputy city attorney, for appellant.

*Donald N. Peterson, II*, of Graybill & Hazlewood LLC, of Wichita, for appellee.

Before GREEN, P.J., STANDRIDGE, J., and MCANANY, S.J.

PER CURIAM: This is the second appeal to us regarding the dispute between Jeffrey L. Luper and the Board of Trustees of the Police & Fire Retirement System of Wichita (the Board) over his eligibility for disability benefits, which the Board has twice denied. At this point, a brief history of the case is in order.

Luper had been a firefighter in the Wichita Fire Department since 1996, but he ultimately was unable to perform his duties as a firefighter, and in 2011 he was discharged. Over the years Luper had various medical problems, including chronic

1

alcoholism, various psychiatric disorders such as depression and anxiety, and a fracture of his spine, as well marital problems at home. But the condition he claimed caused him to be permanently disabled and unable to perform his duties as a firefighter was posttraumatic stress disorder (PTSD) brought on by his repeated exposure to traumatic events during his service as a firefighter. The Board denied Luper's disability claim, and his appeal of that decision ultimately found its way to our court.

On review we reversed the Board's initial denial of Luper's disability claim because the Board failed to adequately consider the evidence of Luper's PTSD, which need not be the sole cause of Luper's disability to qualify him for service-connected disability benefits. We further noted that the Board failed to have a medical expert review and opine on Luper's claim. *Luper v. Board of Trustees of Police & Fire Retirement Bd.*, No. 108,379, 2013 WL 2395679, at *9 (Kan. App. 2013) (unpublished opinion).

On remand, the Board engaged a psychiatrist to meet with Luper, review his medical records, and opine on the cause of Luper's disability. On further review of the matter, including the psychiatrist's report, the Board again denied Luper's disability claim.

On appeal the district court reversed the Board's decision, determining that Luper was eligible for permanent service-connected disability benefits. The Board's appeal of the district court's decision again brings the matter to us. Based on our independent review of the record, we conclude that the Board erred in denying Luper's claim and the district court did not err in so finding.

FACTUAL AND PROCEDURAL HISTORY

Let us fill in a few more details about Luper's claim. He became a firefighter in 1996 and rose through the ranks on the Wichita Fire Department during his 15-year

2

career, eventually becoming a lieutenant in the Fire Investigation Unit. He had a plethora of adverse medical and psychological conditions that preceded his discharge from the department on September 16, 2011.

Luper had a long history of alcohol abuse that started when he was about 15 years of age. But problems with his job performance at the fire department started in about January 2010, after he had been a firefighter for about 14 years.

On January 3, 2010, a close friend of Luper's, Captain Urban Eck, died while fighting a fire. Luper was asked to attend Eck's autopsy. This so upset Luper that the request that he attend the autopsy was withdrawn.

Over his years as a firefighter Luper had experienced a number of traumatic incidents. These included incidents in which he (1) administered cardio-pulmonary resuscitation (CPR) to a child who drowned; (2) administered CPR to a child with a debilitating disease; (3) assisted with the removal from wreckage of a body that felt "like . . . jello" and the smell of "blood, guts, and beer remains distinct and memorable to this day"; (4) looked into the eyes of a deceased young girl whose head was 180 degrees from her body; (5) witnessed a young woman placed in a body bag who still had a pulse; (6) administered CPR to a man long enough for his family to say goodbye; (7) engaged in a string of exceptionally gruesome car wreck extractions; and (8) attended autopsies of fire victims, including those of children. Luper later reported that he did not deal with his feelings about these incidents at the time but denied they affected him and over time pretended they never happened.

In his earlier years at the fire department, before 2006, Luper had taken leave from work about 23 to 53 hours a year. Between 2006 and 2009 Luper's leave time increased to over 200 hours a year.

Later in January 2010, after Captain Eck's autopsy, Luper went to the hospital with complaints of shortness of breath, pulmonary edema, and hypertension following a ski trip to Colorado. His medical history included long-term alcohol abuse and depression over the past 10 years. He was dismissed with a diagnosis of major depressive disorder with anxiety.

In May 2010, Luper was admitted to the hospital with a reported history of chronic alcohol abuse along with diabetes, high cholesterol, and possible PTSD. After his hospital stay Luper started an outpatient alcohol treatment program. The program was not successful. Three months later, on August 21, 2010, he was again at the hospital emergency department where he reported that he was drinking a pint of vodka a day. The following week he was admitted to the Hazelden Foundation Treatment Center in Minnesota for five days of inpatient treatment.

By October 2010, Luper was contemplating suicide due to an extramarital affair, other family problems, and his heavy drinking. Luper was eligible for help under the fire department's Employee Assistance Program so he was referred to Dr. Ralph Bharati, a psychiatrist who specializes in treating substance abuse. Dr. Bharati prescribed Antabuse and ordered outpatient treatment. Ten days later, Luper again saw Dr. Bharati and admitted he had relapsed into drinking. Dr. Bharati noted Luper's symptoms of PTSD and opined that Luper, who was currently off work, should not return to any rescue work at the fire department but could handle the job of a fire investigator.

Luper returned to work on December 6, 2010. The following month he completed his outpatient treatment program and was discharged to aftercare.

Between January and August of 2010, Luper took over 400 hours of sick leave and vacation time.

4

Luper began drinking again. On February 21, 2011, Luper fell in the bathroom at home and fractured his thoracic spine. He was treated with Oxycontin, a potentially addictive opioid analgesic, which he continued to take for several months.

By June 2011, Luper's back problems persisted, he was still taking Oxycontin, he had stopped attending AA meetings, and he was drinking again—currently 1.5 pints of vodka a day. He was taken to Via Christi Hospital where he reported being despondent, tired, and hopeless. He was not sleeping and was unable to return to work. He complained of PTSD from his work as a firefighter. After leaving Via Christi he again saw Dr. Bharati who noted Luper's ongoing problems with nightmares and flashbacks which led to feelings of depression which led to more drinking.

In July 2011, Dr. Bharati referred Luper to a social worker in Dr. Bharati's office for Luper's ongoing PTSD and addiction issues. That month Luper left the family home and moved in with his parents.

In August 2011, Luper applied for service-related disability benefits based on his PTSD which, he claimed, rendered him incapable of working for the fire department. He contended that his PTSD was brought on by his exposure to the traumatic incidents noted earlier which he experienced over his 15-year career as a firefighter, culminating in and finally triggered by the death of Captain Eck. Luper asserted that this latest incident caused him to "physically and emotionally" collapse and that he "has not been the same since." He stated that with the death of Captain Eck "[i]t was as if the floodgates were opened and all the bad thoughts, images, and memories came pouring back into my life."

Dr. Bharati provided his report to the Board on August 17, 2011, in which he stated:

"I do think he meets criteria for posttraumatic stress disorder because he suffered a lot of traumatic events while he was working as a fireman . . . and this caused a lot of anxiety and depression in him and resulted in self-medicating and alcoholism. . . . [H]e has been in our intensive outpatient treatment program until today. However, during all this time he continues to relapse in drinking and he has had three or more hospitalizations . . . .

. . . .

"I think the cause of disability is posttraumatic stress disorder because of working as a fireman and doing all these dangerous behaviors . . . . That is the cause of his disability. . . . [H]e is unable to function in any occupation. . . . [I]t is a chronic and delayed onset . . . . [A]t this time, I think his condition is quite permanent and is likely not to make enough progress for him to return to any gainful employment. . . .

". . . [H]is diagnosis is posttraumatic stress disorder and alcohol dependence. These are pretty much the cause of his disability and I think his posttraumatic stress disorder is a permanent one."

Luper was also treated by Dr. Angela Moore, his primary care physician for about eight months. She also provided a report to the Board in August 2011, in which she stated:

"Because of his history of psychiatric treatment with Dr. Bharati as well as several stays in inpatient detox, he does not appear to be recovered. In my professional opinion, based on my observations, evaluations and review of records from the hospital and Dr. Bharati, he has the diagnosis of alcoholism, depression with anxiety and posttraumatic stress disorder. He is permanently disabled from the career of firefighting and I believe he would never be able to return to his career."

Luper was terminated from the fire department on September 16, 2011. In spite of almost a year of treatment and being reassigned to other duties where he could avoid exposure to incidents like those which he claimed triggered his PTSD, Luper's condition

6

declined to the point that the fire chief certified to the Board that he did not recommend that Luper continue to work for the department in any capacity.

The City of Wichita had established a retirement system for its police and firefighters in Charter Ordinance 215, Code of Ordinances of the City of Wichita. Aside from the typical age-related retirement, the ordinance provided for service-connected disability benefits based on the following:

> "SECTION 19. Permanent Service-Connected Disability Benefits. Any Member, who shall, while engaged in the performance of his or her duties, be permanently injured or disabled, other than as the result of an occupational disease, and upon an examination by a physician or physicians appointed by the Board of Trustees, be found to be physically or mentally disabled as a result of such permanent Disability or injury so as to render him incapable to perform the duties of the position held by the Member at date of Disability, shall be entitled to be retired, and the Board of Trustees shall thereupon order such Member's retirement and upon being retired, the Member shall be paid a benefit equal to seventy-five percent (75%) of the Salary in effect on the date when Salary payments ceased. The benefit shall be established according to the charter ordinance that is in effect at the time Salary payments ceased."

Section 3 included the following definitions:

> "'Act of Duty' means an act performed by a Member within the scope of occupational duties inherently involving special risks not generally assumed by a citizen in the ordinary walks of life, for the purpose of protecting life or property, including any act of heroism as a Member.
>     . . . .
> "'Disability' means total inability to perform permanently the duties of the position held by the Member at date of Disability due to a physical or mental incapacity resulting from external force or violence or disease.
>     . . . .

7

"'Service-Connected Disability' means any physical or mental incapacity resulting from external force, violence, or occupational disease occasioned by an Act of Duty as a Police or Fire Officer, imposed by the ordinance or rules and regulations of the City, or any other Disability, which may be directly attributable to the performance of an Act of Duty."

The Board made its ruling on Luper's application for disability benefits in November 2011.

The Board found: (1) Dr. Bharati opined that Luper's work as a fireman caused his PTSD and his disability, but Dr. Moore's letter did not link Luper's condition and disability to the performance of his duties as a firefighter; (2) Luper's medical records showed that he had been abusing alcohol since he was a teen, before he came to work for the fire department; and (3) Luper's sick leave usage spiked in 2005 and remained consistently high for several years before the autopsy incident, which Luper identified as the key event precipitating his PTSD. The Board denied Luper's claim, stating:

"On the facts before it, the Board is unable to reasonably conclude that the applicant's condition, including any presently existing condition of PTSD, was actually caused by the applicant's job activities as opposed to the emotional abuse and family problems he has suffered, his long history of alcohol abuse, and the medical and family problems he has developed secondary to his longstanding alcohol abuse and dependency."

Referring to § 19 of Charter Ordinance 215, the Board concluded that Luper did not prove that his incapacity was a

"'physical or mental incapacity resulting from external force, violence, or occupational disease occasioned by an Act of Duty as a Police or Fire Officer, imposed by the ordinance or rules and regulations of the City, or any other Disability, which may be directly attributable to the performance of an Act of Duty.'"

8

Luper appealed the Board's decision to the district court, which affirmed the Board. Luper appealed the district court's ruling, and another panel of this court heard Luper's appeal. See *Luper*, 2013 WL 2395679.

There, our court held that the Board's decision was arbitrary and capricious in light of the "uncontradicted medical opinion of Dr. Bharati that Luper had PTSD caused by traumatic events he experienced as a firefighter" and the "wholly irrelevant issue" of what caused Luper's alcoholism was not an appropriate reason to reject the opinion of Dr. Bharati. 2013 WL 2395679, at *6. The panel stated: "Before acting on Luper's claim, the Board had the duty to seek further information on the nature of PTSD, its cause and symptoms, and the temporal relationship between traumatic events and its onset." 2013 WL 2395679, at *9. The panel concluded by holding:

"Because the Board arbitrarily and capriciously rejected the expert medical opinion of Dr. Bharati without seeking further medical information on Luper's disability and its cause and without exercising the option of obtaining an independent medical examination of Luper to determine his condition and its cause, we must reverse and remand this case to the district court with directions that it remand Luper's application to the Board for further proceedings consistent with this opinion." 2013 WL 2395679, at *9.

On remand, the Board retained Dr. Jan Campbell for an independent medical examination. The Board requested that her report include

"the nature and causes of Mr. Luper's condition, whether or not you believe the causes of Mr. Luper's condition are work-related, whether or not such condition is permanent and the degree to which his condition impacts his ability to perform the duties of a Fire Prevention Inspector I, the job duties of which are enclosed. To the extent possible, please relate your findings to both Mr. Luper's current condition and his condition at its original presentation for the Board's consideration. Please include in that report your concurrence with or distinction from the other medical providers Mr. Luper has seen,

9

along with any other information you deem pertinent. Additionally, we would also like you specifically comment on the opinion of Dr. Bharati's contained in his letter, dated August 17, 2011, and whether and to what extend you agree or disagree with it."

In September 2014, Dr. Campbell provided her report. In summary, she agreed with Dr. Bharati that Luper meets the criteria for PTSD, that Luper's PTSD is attributable to work-related traumas, and that Luper should not return to work as a firefighter until after he has completed treatment and can demonstrate that his PTSD symptoms have subsided. Dr. Campbell could not determine whether Luper's PTSD was permanent because there was an "absence of aggressive treatment" for it. She concluded that "Luper's ability to function in any capacity is impaired by his alcohol dependence, which is his primary diagnosis." But she emphasized that Luper's alcoholism and PTSD are intertwined, and his alcohol dependence made him predisposed to developing PTSD from incidents at work.

The Board requested additional information from Dr. Bharati on remand as well. Dr. Bharati interviewed Luper and provided a letter to the Board in March 2015 in which he reaffirmed that Luper had PTSD arising from work-related traumas, that his PTSD was a delayed onset disorder, that Luper's ongoing treatment for PTSD was appropriate, and that Luper's PTSD was a permanent condition. Dr. Bharati concluded that Luper should not return to work as a firefighter because "[h]e will relapse into drinking or become suicidal" or have "more exacerbated PTSD symptoms."

Jennifer Hecht, one of Luper's counselors at Prairie View Mental Healthcare Center, had previously provided similar concerns as Dr. Bharati to the Board. In November 2014, the counselor stated that Luper was working on both his PTSD and alcohol dependency and that they were "very much interrelated" as Luper had used alcohol to cope both with traumas in his past and traumas he experienced as a firefighter. She also noted that

10

"[w]ith Jeffrey's ongoing symptoms, returning to work as a fire fighter would most likely increase his symptoms and decrease his ability to function on a daily basis. Further, even without ongoing symptoms, returning to work as a fire fighter and having repeated exposure to traumas would make Jeffrey very vulnerable for recurring PTSD symptoms. Therefore, I could not recommend that he return to work as a firefighter at any time in the future."

On March 23, 2016, the Board denied Luper's claim after finding:

"The medical evidence establishes that the applicant's exposure to any past traumatic events experienced as Acts of Duty only lead to PTSD symptoms when he chose to abuse alcohol. It is unquestioned that the applicant has been a chronic abuser of alcohol from the age of 15; his alcoholism was not caused by any Act of Duty. The medical records do not establish any Act of Duty trigger that instigates relapses from alcohol treatment, nor has applicant made that claim. Those instances with any recorded cause are tied to incidents in the applicant's personal life. While successfully under Dr. Bharati's treatment, the applicant even described experiencing minor PTSD symptoms which he said would not be a problem for him at work."

The Board concluded that

"the incapacity associated with the present condition of the applicant has not been shown to be a 'physical or mental incapacity resulting from external force, violence, or occupational disease occasioned by an Act of Duty as a Police or Fire Officer, imposed by the ordinance or rules and regulations of the City, or any other Disability, which may be directly attributable to the performance of an Act of Duty.'"

Luper appealed to the district court, which reversed the Board's decision, and the Board appealed. As we will briefly discuss, our review of the Board's decision is de novo and thus not controlled or bound in any way by what the district court found or concluded. Nevertheless, to provide context for the Board's claims on appeal, it is

11

worthwhile to set forth the district court's analysis which, as shall be seen, is for the most part consistent with our own analysis of the Board's action.

The district court reversed the Board's decision on two bases.

First, the district court determined that the Board did not evaluate Luper's claim consistent with the mandate from this court. The district court noted that under *Luper*, 2013 WL 2395679, Luper's PTSD need not be the sole cause of a service-connected disability; rather, the disabling condition need only be "directly attributable to the performance of an Act of Duty." Thus, "[t]he relevant question for the Board is not whether Luper's alcoholism impacted his work. Rather, the relevant question is whether Luper's PTSD constituted a mental incapacity that rendered him permanently unable to perform the duties of his job." The district court stated that "the Board was directed to focus its attention on Luper's PSTD to determine whether that condition rendered him eligible for disability benefits under Ordinance No. 215." But "[d]espite this direction, the Board in its second denial again turns its focus primarily to Luper's alcoholism."

The district court concluded:

"Dr. Campbell's review of Luper's medical records and history established that Luper began to experience symptoms of PTSD early in his career and that he experienced a gradual escalation of anxiety and depression as be had increased his exposure to traumatic events; that Luper suffered from sleep disruption and recurrent nightmares of trauma scenes as well as intrusive thoughts of trauma events; that Luper felt guilt and shame due to his inability to rescue people; that Luper suffered from apprehension and fear when he heard alarms indicating trauma calls; that Luper began suffering the onset of PTSD symptoms at least by January of 2010, and that the symptoms persisted for longer than six months; that Luper's PTSD symptoms interfered with his ability to function as an employee of the fire department; and, significantly, *that Luper's PTSD symptoms persisted during periods of confirmed abstinence from alcohol*.

12

"Despite this documentation in Luper's medical records, Dr. Campbell then committed the same analytical error that the Board did in its first denial of Luper's disability claim—she states that PTSD 'is not his primary diagnosis or the source of his disability.' Again, the question is not whether PTSD is Luper's primary diagnosis, or the source of his disability. The question is whether Luper's PTSD is a disabling condition directly attributable to the performance of an Act of Duty."

Second, the district court found that the Board's denial of Luper's disability benefits was not supported by substantial competent evidence. The district court held that the Board "cherry pick[ed]" portions of Dr. Campbell's report to reach the outcome it desired despite the "overwhelming evidence in the medical records that Luper suffers from PTSD." The district court, in part, provided the following examples:

"The Board obviously did not view favorably the opinions of Dr. Bharati. However, its criticism of Dr. Bharati's opinions are one sided. For example, the Board was critical of Dr. Bharati's diagnosis of Luper's PTSD because it was based on Luper's subjective reports of bad dreams and related symptoms. But the Board accepted Dr. Campbell's conclusion that Luper suffered from PTSD, despite the fact that Dr. Campbell's diagnosis relied upon the same subjective reports from Luper, and even relied upon medical records generated by Dr. Bharati in his treatment of Luper. The Board was critical of Dr. Bharati for failing to make the connection that Luper's PTSD symptoms 'occur for the applicant in association with incidents of alcohol abuse, but not with traumatic or other triggering events absent alcohol abuse.' But the Board ignored the fact that Dr. Campbell likewise found that Luper's PTSD symptoms persisted during periods of confirmed abstinence from alcohol, suggesting that the physiological effects of alcohol were not responsible for the various symptoms of PTSD."

The district court concluded that there was overwhelming evidence in the medical records that Luper suffers from PTSD caused by his experiences on the job as a firefighter. Moreover, it was Dr. Bharati's opinion that Luper's PTSD prevented him from performing his duties as a firefighter, and Dr. Campbell "simply did not address this question." Dr. Bharati opined that Luper's PTSD was a permanent condition, but Dr.

13

Campbell had no opinion on the matter because she did not think a conclusion could be made without first having Luper engage in "aggressive treatment" for his PTSD. The district court concluded:

"What is uncontroverted is that Luper's PTSD symptoms manifested in 2010, and were still present when Dr. Campbell interviewed him in 2014. Despite pharmacological treatment, the symptoms of PTSD have not abated. According to Dr. Bharati, there is no treatment for PTSD that was very established. Luper's PTSD has persisted for four years despite the medication Luper has taken to remediate the symptoms. Dr. Bharati stated that Luper's PTSD was a chronic, permanent condition. The records from Behavioral Health & Addiction Services state that Luper was expected to have to treat his PTSD for the rest of his life. Jennifer Hecht was of the opinion that Luper would always be vulnerable to a reoccurrence of PTSD if he was exposed to future traumatic events. And while there is some evidence in the record that EMDR therapy [eye movement desensitization therapy] would help alleviate Luper's current PTSD symptoms, there is no evidence in the record that such therapy would inoculate Luper from a reoccurrence of PTSD if he was exposed to future traumatic events, or that any of Luper's mental health care providers (with the exception of the Hazelden Foundation, an out of state addiction treatment center) even prescribed this treatment. The Board simply cannot disregard this evidence in reliance on Dr. Campbell, who had stated that she was unable to determine whether Luper's PTSD was a permanent condition. Decisions that are unreasonable, without foundation in fact, and not supported by substantial evidence are arbitrary and capricious. *Denning v. Johnson County, Sheriff's Civil Service Bd.*, 46 Kan. App. 2d 688, 701, 266 P.3d 557 (2011), affirmed 299 Kan. 1070 (2014)."

The district court ultimately held:

"It is understandable that the Board is reluctant to approve disability benefits for an alcoholic. But there is no evidence in the record that alcoholism causes PTSD—rather, the conditions are interrelated. And because the Ordinance that defines Luper's eligibility for disability benefits is structured such that PTSD does not have to be the sole cause of Luper's disability, Luper is eligible for disability benefits despite the fact that he is an alcoholic."

14

This brings us to the Board's appeal, which is under K.S.A. 60-2101(d), which "confers jurisdiction on a district court to review the action of a political subdivision exercising 'judicial or quasi-judicial functions.'" *Robinson v. City of Wichita Employees' Retirement Bd. of Trustees*, 291 Kan. 266, 270, 241 P.3d 15 (2010). In appeals under K.S.A. 60-2101(d), the district court's task is to determine whether the Board's "decision was within its scope of authority, was substantially supported by evidence, or was fraudulent, arbitrary, or capricious." 291 Kan. at 270. On further review by our court, we review the Board's decision de novo using the same grounds as the district court was directed to apply in its initial review. See *Butler v. U.S.D. No. 440*, 244 Kan. 458, 464, 769 P.2d 651 (1989).

*The Board's Claims*

The Board claims that the district court erred in three aspects: (1) in finding that the Board did not comply with our court's directions on remand, (2) in reversing the Board when there was no external force or violence upon Luper that caused his disability, and (3) in finding that the Board's decision was not supported by substantial competent evidence and was arbitrary or capricious. In the alternative, the Board argues that if the district court did not err in these respects, it assessed the incorrect effective date of disability.

● *Compliance with the Court of Appeals' Directions on Remand*

The Board's complaint that the district court erred in finding that the Board did not comply with our court's directions on remand raises a question of law over which our review is unlimited. *Leffel v. City of Mission Hills*, 47 Kan. App. 2d 8, 15-16, 270 P.3d 1

(2011). But, as we noted earlier, because in our review we examine the Board's decision anew using the same grounds as the district court was directed to apply in its initial review, resolution of this issue one way or another does not affect the ultimate outcome of this appeal. Nevertheless, for the sake of completeness, we will briefly address this issue.

In the initial appeal, we directed the Board to seek further information on the nature of Luper's PTSD, its cause and symptoms, and the temporal relationship between Luper's traumatic events and the onset of his PTSD. Our court stated:

"The Board acknowledges that a disability cause need not be the sole cause. We find no expert medical opinion evidence that Luper does not have PTSD, as Drs. Bharati and Moore stated; nor do we find expert medical opinion evidence that Luper's PTSD was caused by his alcoholism and not his exposure to traumatic events at work. Yet the focus of the Board in its analysis is exclusively on Luper's alcoholism, except for the two references to the expert medical opinions of Luper's treating doctors, which the Board rejected.

"With the growing concern for the mental conditions of our military personnel returning from the stress and trauma of foreign wars, PTSD has become a relatively familiar concept to many Americans. But our common lay understanding of this disorder is neither deep nor precise. In his letter opinion, Dr. Bharati says that Luper meets the criteria for PTSD but does not specify those criteria. He mentions in passing that PTSD is 'chronic and delayed onset' but does not expand on those concepts. The Board noted that Dr. Moore also found that Luper 'is permanently disabled as a result of alcoholism, depression with anxiety and PTSD.' While a member of the screening committee apparently made some inquiry of Dr. Moore, the Board made no inquiry of Dr. Moore as to the cause of Luper's PTSD.

"Before acting on Luper's claim, the Board had the duty to seek further information on the nature of PTSD, its cause and symptoms, and the temporal relationship between traumatic events and its onset. Having rejected the opinion of Dr.

16

Bharati based on his analysis of the cause of Luper's alcoholism, not on Dr. Bharati's analysis of the cause of Luper's PTSD, the Board needed to question Dr. Bharati about his findings, to seek out an independent psychiatric evaluation and report of Luper's disability claim, or both.

"Because the Board arbitrarily and capriciously rejected the expert medical opinion of Dr. Bharati without seeking further medical information on Luper's disability and its cause and without exercising the option of obtaining an independent medical examination of Luper to determine his condition and its cause, we must reverse and remand this case to the district court with directions that it remand Luper's application to the Board for further proceedings consistent with this opinion.

"Reversed and remanded with directions." *Luper*, 2013 WL 2395679, at *8-9.

On remand, the Board obtained additional medical records from Luper and sought out Dr. Campbell, an experienced psychiatrist with experience in the areas of PTSD and alcoholism. Dr. Campbell provided information to the Board regarding Luper's PTSD. In addition, the Board presented specific follow-up questions to Dr. Bharati and allowed Dr. Bharati to review and address Dr. Campbell's report. We are satisfied that the Board complied with our court's mandate on remand.

● *External Force or Violence as the Cause of Luper's Disability*

Next, the Board argues that although all of the events that caused Luper's PTSD were "emotionally troubling," none involved any external force or violence directed at Luper or in his presence which is required under Ordinance No. 215 in order to constitute a "service-connected disability."

17

Section 3 of Ordinance No. 215 provides:

> "'Service-Connected Disability' means any physical or mental incapacity resulting from external force, violence, or occupational disease occasioned by an Act of Duty as a Police or Fire Officer, imposed by the ordinance or rules and regulations of the City, or any other Disability, which may be directly attributable to the performance of an Act of Duty."

This raises what appears to be a new issue of law that was not raised by the Board in denying Luper's application. The Board concedes in its appellate brief before us that "the Board's discussion did not specifically focus on this issue." To the extent of any consideration we give to this new issue, our review is unlimited. See *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, 659, 367 P.3d 282 (2016).

First, it does not appear that the Board's decision was based on the fact that there had been no physical impact on Luper's body or physical injury to Luper in the course of the traumatic events that preceded his PTSD symptoms. We note that nowhere in the Board's analysis of its findings of fact does the Board refer to any finding that in order to establish a service-connected disability under Charter Ordinance 215, the disability must arise from a physical impact on the applicant's body while serving as a firefighter.

The Board made the following conclusions in denying Luper's application:

> "The Board finds the evidence before it does not establish Post-Traumatic Stress Disorder as a service-connected disability occasioned by an Act of Duty under Charter Ordinance 215. The medical evidence establishes that the applicant's exposure to any past traumatic events experienced as Acts of Duty only lead to PTSD symptoms when he chose to abuse alcohol. It is unquestioned that the applicant has been a chronic abuser of alcohol from the age of 15; his alcoholism was not caused by any Act of Duty. . . .

18

"[T]he incapacity associated with the present condition of the applicant has not been shown to be a 'physical or mental incapacity resulting from external force, violence, or occupational disease occasioned by an Act of Duty as a Police or Fire Officer.'"

We read this not as a conclusion that PTSD cannot qualify as a service connected disability because Luper did not experience any physical impact on his body in the incidents which he claimed brought about his PTSD, but rather as a conclusion by the Board that the cause of any present disability is not connected to Luper's service as a firefighter but to his alcohol abuse which predates his employment at the fire department. That is, in discussing "the incapacity associated with the present condition of the applicant," the "incapacity" the Board was referring to was Luper's chronic alcoholism, not his PTSD.

The Board is simply attempting to justify its ruling by bootstrapping into the record a finding it did not make and a conclusion it did not draw in denying Luper's application for benefits before this matter was appealed.

By way of this argument, the Board seeks to bind us to decisions in tort and workers compensation cases which require a physical impact on the plaintiff/claimant or a relatively immediate physical injury to the plaintiff/claimant after the incident to support a cognizable claim. But this is neither a tort nor a workers compensation case. The issue is whether Luper has a contractual right to service-connected disability benefits under the disability plan adopted by the City of Wichita for members of the police and fire departments.

Once again, Section 3 of Ordinance No. 215 provides:

"'Service-Connected Disability' means any physical *or mental incapacity* resulting from external force, violence, or occupational disease occasioned by an Act of Duty as a Police or Fire Officer, imposed by the ordinance or rules and regulations of the

19

City, or any other Disability, which may be directly attributable to the performance of an Act of Duty." (Emphasis added.)

A service-connected disability under the ordinance requires either a physical or mental incapacity resulting from external force or violence while the applicant is in the line of duty. The ordinance does not require a physical *injury*, merely a physical *or* mental *incapacity*. One can suffer a mental incapacity without a physical injury.

Further, we read the "occasioned by" language in the ordinance as creating a nexus between the force or violence and the firefighter's act of duty, which in the incidents listed by Luper consisted of the nexus between the violent, traumatic, life-threatening episodes Luper confronted as a firefighter and the extraordinary lifesaving efforts he made in the line of duty. Those incidents

"included incidents in which he administered cardio-pulmonary resuscitation (CPR) to a child who drowned, administered CPR to a child with a debilitating disease, administered CPR to a man long enough for his family to say goodbye, engaged in car wreck extractions, saw a woman placed in a body bag who still had a pulse, and attended autopsies of fire victims." *Luper*, 2013 WL 2395679, at *2.

Finally, while the ordinance does require "external force or violence," there is no clear requirement that the external force or violence be directed at the firefighter acting in the line of duty. If there were such a requirement, we would expect there to be a requirement of a physical injury to the firefighter. But in order to come within the purview of the ordinance, the firefighter need only experience a mental incapacity as a result of being confronted by a violent situation experienced in the line of duty. Such was Luper's situation.

We conclude that the Board's new rationale for upholding its ruling does not bar Luper's claim.

20

● *Evidence Supporting the Board's Denial*

Finally, the Board argues that its denial of Luper's disability application was not arbitrary or capricious but rather was based on substantial evidence. In our de novo review our task is to determine whether the "Board's decision was within its scope of authority, was substantially supported by evidence, or was fraudulent, arbitrary, or capricious." *Robinson*, 291 Kan. at 270.

In the first appeal of this case our court held that "under the City's ordinance, a condition such as alcoholism or PTSD need not be the sole cause of a service-connected disability," and the Board previously conceded that Luper's "disability cause need not be the sole cause." *Luper*, 2013 WL 2395679, at *4, 8. Moreover, we noted: "Luper does not claim he is disabled from alcoholism brought on by his exposure to traumatic events as a firefighter. He claims he suffers from PTSD. Thus, the issue is whether Luper has work-induced PTSD, not work-induced alcohol dependency." 2013 WL 2395679, at *6.

Thus, as previously held, what the Board had to determine was (1) whether Luper has PTSD related to acts of duty as a firefighter which renders him incapable of performing his duties as a firefighter, and if so, (2) whether Luper's PTSD is permanent.

On remand, the Board provided the following analysis of its findings of fact:

> "In order to distinguish between these medical opinions, the Board looked at the professional rigor they each demonstrate. Both doctors had available the same medical records for review. Dr. Campbell's opinion accounts for the applicant's history of alcohol abuse dating back to the age of 15 and what the applicant describes as alcohol consumption at a consistent, frequent and intense level. Dr. Bharati acknowledges that history, but asserts without support in the record a significant increase in the applicant's alcohol consumption when he is confronted with traumatic events at work. Dr. Campbell

21

describes from her clinical experience how alcohol abuse can be the trigger for PTSD symptoms, while Dr. Bharati states that exposure to trauma causes PTSD symptoms, and then assumes, again without support in the record, that PTSD symptoms greatly exacerbated the applicant's problem with alcohol abuse. This assumption runs contrary to Dr. Bharati's own course of treatment results. Dr. Bharati's records demonstrate that while under his care in a successful alcohol treatment program, the applicant's PTSD symptoms were greatly reduced. A similar result occurred during the applicant's inpatient treatment at Hazelden. During the course of that six week, enforced sobriety, PTSD was dropped from the applicant's diagnosis, and the treating psychiatrist affirmatively stated that the applicant was leaving Hazelden with no mental health issues. During two different, later periods of extended sobriety, the applicant confirmed that PTSD symptoms were not a problem. See findings of fact at paragraphs 48-51 and 93.

"Dr. Campbell used extensive records review, psychological testing, and a clinical interview as the basis of her opinion, and provided substantial documentation of the information leading to her conclusion. Her conclusion was that PTSD, although present, was not the primary diagnosis appropriate for the applicant, and more importantly was not the source of his disability. She also found that the applicant's past treatment episodes have focused on alcohol dependence, with very minimal treatment for PTSD. The limited PTSD treatment given at Hazelden was effective, by the applicant's own account, but that EMDR therapy from a psychiatrist has never again been utilized. The applicant's choice not to seek EMDR treatments for PTSD runs counter to both his own earlier positive experience and the express recommendation of Dr. Campbell. Instead, the applicant has sought pharmacological treatment from a nurse practitioner. The applicant's wife has described this treatment as adversely affecting the applicant's cognition. Dr. Campbell stated that the minimal (and later detrimental) treatment for PTSD makes it impossible to determine whether the applicant is disabled by PTSD, nor whether, if so, such a condition is permanent.

"Dr. Bharati expressly stated that his diagnosis of PTSD as permanently and totally disabling for the applicant was substantiated 'in the history'. The support he provides is the applicant's subjective account of dreams and related symptoms, and Dr. Bharati's general recollection of the association of those symptoms with triggering events. Dr. Bharati does not make the connection that such symptoms occur for the

22

applicant in association with incidents of alcohol abuse, but not with traumatic or other triggering events absent alcohol abuse. Dr. Bharati did not describe using the psychological testing data available to him in the medical records. Most importantly, Dr. Bharati came to his initial conclusion on August 17, 2012 based on the applicant's subjective accounts of mental symptoms, less than three weeks after concluding in his own notes that he did not trust the applicant. See finding of fact paragraph 71. There was no ensuing treatment session to alter that opinion of veracity. Indeed, the applicant skipped a scheduled session, attended only by his wife, and never again saw Dr. Bharati for treatment. In Dr. Bharati's later opinion of March 5, 2015 this inconsistency is still unresolved."

There is no question that Luper suffers from PTSD arising from events he experienced as a firefighter. Both Drs. Bharati and Campbell agree with this diagnosis. Dr. Campbell, the psychiatrist retained by the Board, reviewed Luper's medical records and interviewed Luper. She concluded that Luper began to experience symptoms of PTSD early in his career as a firefighter and that he experienced a gradual escalation of anxiety and depression as he had increased exposure to traumatic events associated with his duties as a firefighter. She reported that Luper suffered from nightmares of trauma scenes, sleep deprivation, intrusive thoughts of trauma scenes, guilt and shame that he could not rescue individuals, and apprehension and fear when he would receive trauma calls. She determined that Luper began suffering the onset of PTSD symptoms at least by January 2010, and that the PTSD symptoms persisted for longer than six months. She concluded that Luper's PTSD symptoms interfered with his ability to perform his duties as a firefighter. Finally, and significantly, she confirmed that Luper's symptoms, although reduced, persisted during periods of confirmed abstinence from alcohol. She stated "[a]lthough Luper had been alcohol-dependent throughout the course of developing PTSD, some symptoms persisted during the periods of confirmed abstinence and thus the psychological effects of alcohol could *not* be responsible for the various symptoms and disturbances described in Luper's records." (Emphasis added.)

23

Dr. Campbell concluded that PTSD "is not [Luper's] primary diagnosis or the source of his disability." But, as shown earlier, PTSD need not be the sole cause of Luper's disability, and Luper is not claiming disability based on his alcoholism. He is claiming a disability based on his PTSD, which Dr. Campbell has confirmed persists both during times of alcohol use and to a lesser extent during times of confirmed sobriety.

Moreover, Luper's PTSD is not a product of his alcohol abuse. Dr. Campbell's diagnosis of PTSD under the current version of the Diagnostic Statistical Manual, the DSM-5, requires a finding that the patient's symptoms *are* impairing their social or occupational function (category G) and that those symptoms *are not* caused by substance abuse (category H).

Drs. Bharati and Campbell both agree that Luper has PTSD from acts of duty. Dr. Campbell was unable to reach an opinion as to the severity of Luper's PTSD because, in her opinion, the majority of Luper's hospitalizations and treatment focused on addressing his alcoholism—not his PTSD—and it was not possible for her to determine Luper's prognosis "[i]n the absence of aggressive treatment." Yet Dr. Bharati had treated Luper and was of the opinion that Luper's PTSD was a chronic condition that affected his ability to function as a firefighter and that his PTSD was able to be treated pharmacologically. In essence, with treatment, Luper's PTSD could be managed but his underlying condition will never go away.

While the Board was critical of Dr. Bharati's PTSD diagnosis based on Luper's self-reporting, Dr. Campbell made the same diagnosis based on Luper's self-reporting. The Board was also critical of Dr. Bharati's failure to make the connection that Luper's PTSD symptoms "occur for the applicant in association with incidents of alcohol abuse, but not with traumatic or other triggering events absent alcohol abuse." But Dr. Campbell also found that Luper's PTSD symptoms persisted during periods of confirmed abstinence

24

from alcohol, suggesting that the physiological effects of alcohol were not the precipitating cause of Luper's PTSD symptoms.

While Dr. Campbell did not specifically address whether Luper's PTSD completely prevents him from performing his duties as a firefighter, Dr. Bharati's opinion is that it does, and the record contains no contrary evidence. This conclusion is also supported by one of Luper's counselors. Dr. Campbell opines that Luper cannot function at the fire department because he is an alcoholic, and because this is his primary diagnosis, she did not address whether Luper's PTSD prevents him from working as a firefighter. But that was the central issue to be resolved on remand from our court.

The Board previously conceded that Luper's PTSD need not be the sole cause of his disability. Here, the evidence establishes that Luper was able to function as a firefighter notwithstanding his alcoholism before January 2010. But after he developed PTSD, the combination of his PTSD and his alcoholism left him unable to perform his duties as a firefighter. The Board emphasized that his alcoholism is to blame for his disability because he had been abusing alcohol since he was 15 years old, but it disregarded the fact that Luper functioned as an alcoholic in his career for at least 10 years before the triggering event of Captain Eck's death and autopsy.

The next question to be resolved is whether Luper's disability is a permanent or a temporary condition. Section 3 of Ordinance No. 215 requires that the disability be permanent.

Dr. Campbell stated that it was not possible to determine if Luper's PTSD was permanent because Luper had not made more aggressive efforts to treat his PTSD. Based on this conclusion, it appears that Dr. Campbell believed that a finding of a permanent disability requires a finding that the condition can never be successfully treated. But Ordinance No. 215, Section 19, states:

25

"The Board of Trustees may, when they deem it advisable, call back for re-examination by a physician, any Member retired by reason of permanent Disability under the provisions of this ordinance, and if said examination discloses that said Member is then able to perform his or her duties in said department, he or she may be returned to Service; and if said Member, upon request, fails or refuses to return to duty, then all payments from said System shall cease."

Thus, in enacting this ordinance the City anticipated that following a finding of permanent disability that condition may abate at some future date and allow the previously disabled former employee to return to work.

Black's Law Dictionary's definition of "permanent disability" supports this notion. It defines "permanent disability" as: "A disability that will *indefinitely* prevent a worker from performing some or all of the duties that he or she could do before the accident or illness." (Emphasis added.) Black's Law Dictionary 579 (11th ed. 2019). Black's defines "indefinitely" as: "For a length of time with no definite end." Black's Law Dictionary 918 (11th ed. 2019). Luper's disability meets this definition.

Moreover, while Dr. Campbell did not reach a conclusion on permanency, Dr. Bharati did. He stated that Luper's PTSD was a chronic, permanent condition. Counselor Hecht was also of the opinion that Luper would always suffer from PTSD if he was exposed to future traumatic events. Although there is some evidence in the record that EMDR therapy would help alleviate Luper's PTSD symptoms, there is no evidence that such therapy would inoculate Luper from events that could retrigger his PTSD symptoms.

In the initial appeal in this case, we found that given the paucity of decisions relating to the disability plan set up for firefighters in Wichita, decisions related to plans adopted under the Employee Retirement Income Security Act of 1974 (ERISA), 29

26

U.S.C. § 1001 et seq. (2006), can provide some general guidance. See *Luper*, 2013 WL 2395679, at *7. ERISA cases reflect this same understanding of what is meant by a "permanent" disability as distinct from a "temporary" disability. See *Rote v. Titan Tire Corp.*, 611 F.3d 960, 963 (8th Cir. 2010) (holding "indefinite" restriction, when read in context that there is no reasonably foreseeable end date to the restrictions, qualify as "permanent" for purposes of an ERISA plan).

While we have no comparable reported cases in Kansas, our overall analysis does not create a legal outlier. In *Siwinski v. Retirement Board of the Firemen's Annuity & Benefit Fund of the City of Chicago*, 125 N.E.3d 1085 (Ill. App. Ct. 2019), the Appellate Court of Illinois faced similar facts. There, the claimant was a paramedic who applied for service-connected disability benefits due to PTSD. Her PTSD diagnosis was based on self-reported PTSD symptoms that were not documented until several years after the traumatic events occurred. These traumatic events involved transporting the body of a colleague and being threatened while responding to a shooting. She also struggled with a major depressive disorder that predated her PTSD. The Illinois Appellate Court held that the weight of the evidence showed that Siwinski suffered from PTSD and that the PTSD resulted from at least one act of service and, therefore, the retirement board improperly denied her disability benefits. 125 N.E.3d at 1095-96.

To summarize, Dr. Campbell agrees that Luper has PTSD from work-related traumas. Luper's PTSD prevents him from working as a firefighter. Evidence in the record supports the current permanency of his disability, not a contrary finding. Based on this analysis, we conclude that there is substantial evidence that Luper suffers from a permanent disability and the record does not support a contrary finding. As stated in *Denning v. Johnson County Sheriff's Civil Service Bd.*, 46 Kan. App. 2d 688, 701, 266 P.3d 557 (2011), *aff'd* 299 Kan. 1070, 329 P.3d 440 (2014), an action "is arbitrary and capricious if it is unreasonable, without foundation in fact, not supported by substantial evidence, or without adequate determining principles." Under this standard, the Board's

27

denial of Luper's application for service-connected disability is not supported by substantial evidence and was arbitrary and capricious.

● *The Eligibility Date for Disability Benefits*

For its final issue, the Board contends that the district court incorrectly determined Luper's eligible date of disability benefits as September 17, 2011 because "the court relied on substantially later 2014-2015 evidence for its finding of 'permanence.'"

Our review of the Board's decision is de novo, so although the district court's ruling is interesting in the manner in which it agrees with our analysis, it is ultimately immaterial in deciding the issues in the case.

Luper applied for disability benefits in August 2011. He was later discharged on September 16, 2011. In our analysis we have relied on facts related to Luper's claim that postdate his application for benefits only to the extent that they confirm or memorialize facts regarding Luper's condition as of August 2011 when he applied for disability benefits. Because Luper has been shown to be unable to work as a firefighter since his termination from the fire service, we conclude that he was entitled to disability benefits from and after September 17, 2011, the day following his termination.

In our independent de novo review of the Board's decision, we conclude that the Board erred in denying disability benefits to Luper, and the district court was correct in so finding.

Affirmed.