NOT DESIGNATED FOR PUBLICATION

No. 122,887

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ASHLEY NICHOLE SULLIVAN,
*Appellant*,

v.

KANSAS STATE BOARD OF NURSING,
*Appellee*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed May 28, 2021. Affirmed.

*Andrew Moskow*, of Lawrence, for appellant.

*William J. Skepnek Jr.*, assistant attorney general, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., BRUNS and SCHROEDER, JJ.

PER CURIAM: A Kansas court can reverse an action of a state agency only for reasons specified in the law. Relying on two of these statutory reasons, Ashley Sullivan asks us to overturn the Kansas Board of Nursing's revocation of her nursing license. In her first reason, she contends the Board engaged in an unlawful procedure when it revoked her license. She claims that because the Board had no authority to require her to participate in the Kansas Nurses Assistance Program, it had no authority to revoke her

1

license for failing to complete that Program. For her second reason, Sullivan argues that the Board's decision was unreasonable, arbitrary, or capricious.

Before we dive into the facts here, we review one statute that gives us a legal context for understanding how Sullivan lost her nursing license. She did not lose her license for any dereliction of her nursing duties. She lost her license for not complying with her agreement to abide by the requirements of the Program.

The Legislature has taken an active position in fighting the impairment of licensed professionals from drug and alcohol use. For example, K.S.A. 65-4924(b) allows healthcare licensing boards to contract with an entity that will investigate, monitor, and treat impaired healthcare providers. It is under that authority that the Board here contracted with the Program.

The Board has the option under K.S.A. 65-4924(d) to refer someone to the Program for an evaluation to determine whether there is an impairment if it has reasonable cause to believe that a healthcare provider is impaired. The Board's contract requires the Program to administer the SASSI—a psychological screening tool that helps identify individuals who may have a substance abuse disorder to anyone referred to the Program. The contract also permits the Program to conduct an extended evaluation if "there is a question of possible chemical dependency, serious concerns about diversion or use of drugs related to practice, or serious concerns regarding a participant's openness and cooperation with the evaluation."

This system of testing, identification, classification, treatment, and supervision of possible impairment for alcohol or drug use is where Sullivan found herself after she reported her own alcohol related traffic charge. It is not a quick process. For Sullivan, it began with her arrest in 2011 and ended with the Board's revocation of her license in 2018.

*Sullivan reported her alcohol-related arrest to the Board.*

Sullivan received her nursing license in Kansas in 2007. In June 2011, she was arrested for driving while intoxicated in Clay County, Missouri. Later that year, she reported the arrest to the Board. For the driving offense, Sullivan received a suspended imposition of sentence. This disposition is much like a diversion in Kansas: after Sullivan completed two years of probation, the court dismisses the charge. For an example, see *Hoskins v. State*, 329 S.W.3d 695, 698 n.3 (Mo. 2010).

When Sullivan sought to renew her nursing license in February 2013, she again reported the DWI to the Board. This time, the Board referred Sullivan to the Program for a chemical dependency evaluation and, if warranted, subsequent monitoring.

Sullivan underwent her substance abuse evaluation with Eric Dempsey. Dempsey concluded that, based on her SASSI scores, Sullivan showed a high probability of having a substance dependence disorder. He recommended she abstain from consuming alcohol but did not recommend treatment. He also found that her score on the defensiveness scale was elevated. An elevated score on that scale increases the possibility that the SASSI score fails to identify a person with a substance abuse disorder to about 28 percent.

Following that evaluation, the Program required Sullivan to participate in an extended evaluation program for one year. The conditions of that program required random monthly urine drug tests and abstinence for all nonprescribed mood-altering substances, including alcohol. In response, Sullivan asked the Board to review her case, and said that she would submit more evidence.

Sullivan provided the Board with affidavits attesting to her professional competence and character. She also submitted the findings of a second substance abuse evaluation that she underwent later in April 2013. That evaluation concluded that

Sullivan had a low probability of having a substance dependence disorder. She again had an elevated score on the defensiveness scale, but the evaluator found that it was likely a result of Sullivan's anxiety around the evaluation and "other current life issues," not an attempt to falsify the results. The evaluation concluded that Sullivan did not meet the criteria for a monitoring program.

The Board began proceedings to revoke Sullivan's nursing license for her failure to enter the Program. Before that matter could be heard, Dempsey amended the results of Sullivan's first substance abuse evaluation. He struck the finding that Sullivan showed a high probability of having a substance dependence disorder but still concluded that her score on the defensiveness scale was elevated. The administrative law judge held a hearing on the matter in 2014.

The ALJ revised the initial order in April 2014. The judge found that the Program's request that Sullivan enter into the extended evaluation program was reasonable based on both Sullivan's DWI, and that there was still an uncertainty about whether Sullivan had a substance dependency disorder. The judge concluded that Sullivan engaged in unprofessional conduct under K.S.A. 2013 Supp. 65-1120(a)(6) and K.A.R. 60-3-110(s) (2013 Supp.) by failing to complete the Board's impaired provider program. The judge ordered Sullivan to enter into an extended evaluation agreement with the Program within 30 days. If Sullivan failed to do so, the judge would grant the Board's petition to revoke Sullivan's nursing license.

In compliance with the ALJ's order, Sullivan entered into the extended evaluation agreement in May 2014 for one year. The contract required Sullivan to submit to random urine drug screens. One of the chemicals those drug screens examined was the subject's creatinine level. The Program considered creatinine levels lower than 20 mg/dL to be below normal, and a possible indicator of excessive fluid intake meant to "alter or disguise" the test. In June 2014, in its letter to Sullivan, the Program told her that her

4

creatinine levels were below normal on her last test and instructed her to limit fluid intake before giving a sample. Sullivan's July 2014 creatinine levels were also below normal. These results had consequences for Sullivan.

In October 2014, Sullivan signed an addendum to her extended evaluation agreement about her drug screens. Under the agreement, a third urine sample with below-normal creatinine levels would require a physical by Sullivan's health care provider to diagnose whether she had a condition that caused the irregularity. If the provider did not diagnose a disease, then a fourth test with low creatinine levels would require a blood, hair, nail, or saliva test.

After Sullivan's November 2014 sample again had low creatinine levels, she went to her doctor for a physical exam. The doctor concluded that Sullivan's low creatinine levels may be pathological, but he did not diagnose a disease. When Sullivan's May 2015 sample—the final drug screen during her one-year period—showed low creatinine levels, the Program ordered a blood and hair test.

The Program ordered random blood and hair drug screens on May 26, June 5, and June 12, 2015. Sullivan was aware of each test because she "checked in" for each, meaning that she either called in or logged into a web portal and saw that she had been selected for a test. She failed to submit a test each time. As a result, the Program closed Sullivan's file in June 2015 for noncompliance with the extended evaluation agreement and so notified the Board.

In 2016, the Board started proceedings to revoke Sullivan's nursing license. In its petition, the Board alleged that she had violated K.S.A. 2015 Supp. 65-1120(a)(6) by engaging in unprofessional conduct as defined by regulations promulgated by the Board. This is significant because one way a nurse engages in unprofessional conduct is by

failing to complete the requirement of the Board's impaired provider program. See K.A.R. 60-3-110(t) (2020 Supp.).

The ALJ held a hearing on Sullivan's case in February 2016. At the hearing, the executive director of the Program testified about Sullivan's abnormal creatinine levels and her failure to take the blood and hair tests. He said that Sullivan would have been successfully released from the program if she had passed any of the blood and hair tests.

Sullivan testified that she refused to submit to the blood and hair tests because she did not feel like she should have been in the extended evaluation program to begin with, she had done everything she could to prove that she was a good nurse, and "enough was enough":

> "I mean I think I just felt like enough was enough with everything, and I didn't even feel like I should have been in this program in the first place, and I did everything I could to prove to them that I was a good nurse.
>
> "And the urine samples, it makes it seem like you have to consume a ton of water. It's not like that. You drink enough water to take—I mean I would work 12 hours. I had to go to nights because the labs weren't open for me to urinate during the day, so I had to work nights. I wasn't sleeping. Your schedule's off. And I wouldn't—I would go right when I got off work to do the urine test because I was afraid that if I went home— they told me to—really, I needed to give my first sample of the day. Well, that was impossible for me to do because if I went home and fell asleep and didn't wake up in time, I wouldn't be able to submit the urine test, so I would go after work.
>
> "These diluted samples, I wasn't diluting my urine. So that was just more of I'm in this program, you have to pee in front of somebody. They're—these samples are diluted for whatever reason. I mean I remember the first one I called [the KNAP program manager], crying because I'm like, 'I don't know what to do. I'm drinking water.' That's what I thought you were supposed to do is drink water for a urine test.
>
> "And so with the blood, it was just enough is enough. I'm not—I'm not giving my blood to these people or my hair or anything else because I shouldn't even be in this program."

6

The ALJ granted the Board's request to revoke Sullivan's nursing license. The judge found that Sullivan

- knowingly, willingly, and repeatedly violated the Kansas Nurse Practice Act;
- violated K.S.A. 2016 Supp. 65-1120(a)(7) and K.A.R. 30-3-110(s) (2015 Supp.) when she failed to submit to random testing, which resulted in her case being closed due to noncompliance; and
- repeatedly violated the provisions of K.S.A. 2016 Supp. 65-1120(a)(7) by failing to complete the Program.

Sullivan asked the Board for review of the initial order under K.S.A. 77-527(c) of the Kansas Administrative Procedure Act. She asserted two grounds for review. First, Sullivan claimed that the Board had engaged in unlawful procedure under K.S.A. 77-621(c)(5) by failing to give her notice that her license could be disciplined for violating K.S.A. 2016 Supp. 65-1120(a)(7). Second, Sullivan claimed that the Board's decision was "'unreasonable, arbitrary, or capricious'" under K.S.A. 77-621(c)(8) because it required her, a "non-impaired healthcare provider," to "comply with an impaired provider program." The Board granted review.

The Board issued its final order a year later in March 2018. The Board granted relief on Sullivan's first issue, acknowledging that the Board's petition to revoke her license charged her only with a violation of K.S.A. 65-1120(a)(6), so it was improper for the ALJ to rely on K.S.A. 65-1120(a)(7) when it revoked her license. It reversed that portion of the initial order.

But the Board concluded that the ALJ's finding that Sullivan had committed unprofessional conduct under K.S.A. 2016 Supp. 65-1120(a)(6) and K.A.R. 30-3-110(s) (2015 Supp.) by failing to complete the Program was not arbitrary or capricious. It acknowledged that the initial order had cited K.S.A. 2016 Supp. 65-1120(a)(7) instead of (a)(6) but found that the error was typographical and corrected it. The Board further

7

found that the 2014 initial order constituted a final order, so Sullivan could not challenge the validity of it based on collateral estoppel. Finally, the Board held that, since Sullivan did not appeal the 2014 order and chose to re-enter the Program, it was not arbitrary or unreasonable for the Board to revoke her license when she failed to complete the Program.

As a result, the Board upheld that decision to revoke Sullivan's nursing license under K.S.A. 2016 Supp. 65-1120(a)(6) and K.A.R. 60-3-110(s) (2015 Supp.). Having exhausted her administrative remedies, Sullivan sought judicial review of the revocation ruling.

In due course, the district court affirmed the Board's decision to revoke Sullivan's license for committing unprofessional conduct under K.S.A. 2016 Supp. 65-1120(a)(6) and K.A.R. 60-3-110(s) (2015 Supp.) for failing to complete the Program.

Sullivan makes three arguments on appeal. First, she argues that the district court erred by holding that she is an "impaired provider" under K.S.A. 65-4924. Sullivan then raises two of the statutory grounds listed in K.S.A. 77-621(c). First, she contends that the Board engaged in unlawful procedure under K.S.A. 77-621(c)(5) by revoking her license for skirting the Program. And second, she contends that the Board's decision to revoke her license was arbitrary and capricious under K.S.A. 77-621(c)(8).

*We reject Sullivan's first issue.*

Based on our scope of review, we quickly dispose of Sullivan's first issue. While we will either affirm or reverse the district court's order, our review concerns the agency action, not the district court's decision. That is because we exercise the same limited review of an agency's actions as the district court. We look at this case with fresh eyes, as if the appeal had been made directly to us instead of the district court. *Bd. of Cherokee*

8

*County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017). Because of that, we need not decide whether the district court held that Sullivan was an impaired provider or how it interpreted K.S.A. 65-4924. What we must decide is whether, given the record before it, the Board's decision—not the district court's—meets one of the statutory grounds for relief under K.S.A. 77-621(c). Thus, we will not address Sullivan's complaint about the district court's ruling. But we will look at her two remaining issues.

*The rules that guide us are well established.*

Under K.S.A. 65-1121a(a), the Board's disciplinary decisions are reviewed under the Kansas Judicial Review Act, K.S.A. 77-601 et seq. Under that Act, a court may not substitute its judgment for that of an administrative agency. Instead, the reviewing court may grant relief only when it finds one of the statutory grounds is met. We are concerned with only two:

> "(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;
> ". . . .
> "(8) the agency action is otherwise unreasonable, arbitrary or capricious." K.S.A. 77-621(c).

*We find the Board's procedure lawful.*

Sullivan contends that the Board is limited by law to what it can do. She argues that the Board exceeded its statutory authority by relying on K.S.A. 2016 Supp. 65-1120(a)(6) and K.A.R. 60-3-110(t) to revoke her license. She says that the Board does not have statutory authority to require healthcare workers who are only *potentially* impaired providers to comply with the Program. This means that the Board lacked authority to require her participation with the Program. And if it had no lawful authority to discipline

9

her for breaching the program, the Board engaged in an unlawful procedure under K.S.A. 77-621(c)(5) and this court must reverse.

We are not persuaded. The language of the law convinces us otherwise. Under K.S.A. 65-4924(a), if a report filed with a state licensing agency

"relates to a health care provider's inability to practice the provider's profession with reasonable skill and safety due to . . . abuse of drugs or alcohol, the agency may refer the matter to an impaired provider committee of the appropriate . . . professional society or organization."

More generally, if

"the licensing agency has reasonable cause to believe that a health care provider is impaired, the licensing agency may cause an evaluation of such health care provider to be conducted by the impaired provider committee or its designee for the purpose of determining if there is an impairment." K.S.A. 65-4924(d).

Sullivan reported to the Board that she had been arrested for DWI, and her blood-alcohol content at the time of arrest was nearly twice the legal limit in Missouri. Based on that instance of alcohol abuse, the Board could refer Sullivan to its Program. That Sullivan was granted a diversion-like agreement that ultimately led to a dismissal is irrelevant for evaluating the Board's concern. The charges may have been dismissed, but Sullivan has never disputed that she was guilty of DWI.

The Board has a legal obligation here. Under K.S.A. 65-4924(b), "the state licensing agency [has] the authority to enter into an agreement with the impaired provider" to "undertake those functions and responsibilities specified in the agreement" including "receiving and evaluating reports of suspected impairment from any source"

10

and "performing such other activities as agreed upon by the licensing agency and the impaired provider."

In fact, the Board cited that statute when it contracted with the Program to provide services to Kansas nurses. As one of the many services under that contract, the Program agreed to conduct "an extended evaluation when there is a question of possible chemical dependency, serious concerns about diversion or use of drugs related to practice, or serious concerns regarding a participant's openness and cooperation with the evaluation." Under the Program's extended evaluation agreement, which Sullivan agreed to, Sullivan had to cooperate with requests for random urine drug screens.

After two of her tests showed abnormalities, Sullivan signed an addendum stating that a third abnormal test would require a physical, and, if the doctor did not diagnose a condition causing the abnormality, a fourth abnormal test would require a blood or hair test. Under the agreement, three instances of noncompliance would cause the Program to close Sullivan's file and report her to the Board.

Although both of Sullivan's evaluations concluded that she had a low probability of having a substance dependence disorder, both evaluations showed an elevated score on the defensiveness scale, which both parties agree increases the odds that a substance dependence disorder is undetected. Those scores, together with Sullivan's DWI, could reasonably suggest that there was a question of possible chemical dependency or serious concerns about Sullivan's openness and cooperation with the evaluations.

When we consider that the Program could require Sullivan to participate in its extended evaluation program, and that Sullivan failed three times to provide the requested blood or hair sample, we must conclude that the Program was justified in closing her file and returning it to the Board. Simply put, Sullivan failed to cooperate.

Finally, under K.S.A. 2020 Supp. 65-1120(a)(7) of the Kansas Nurse Practice Act, a failure to complete the Program is grounds for discipline. The Board may "deny, revoke, limit or suspend any license" if a nurse is "guilty of unprofessional conduct as defined by the rules and regulations of the board." K.S.A. 2020 Supp. 65-1120(a)(7). The Board can promulgate rules and regulations to carry out the provisions of the Kansas Nurse Practice Act under K.S.A. 65-1129. And one of the regulations it has promulgated defines unprofessional conduct as, among many other things, "failing to complete the requirements of the impaired provider program of the board." K.A.R. 60-3-110(t) (2020 Supp.) (previously codified as K.A.R. 60-3-110[s] [2015 Supp.]).

When we summarize the record, we see how the Board could act. Sullivan's DWI gave the Board good reason under the statute to refer her to the Program. The results of Sullivan's evaluations, together with her DWI, reasonably suggest that she was a candidate for the Program. When Sullivan refused to give hair or blood samples three times, she failed to complete the Program. And failure to complete the Program constitutes unprofessional conduct under the Board's discipline statute, which allows the Board to revoke, suspend, or limit Sullivan's license.

As a result, we hold the Board had statutory authority to revoke Sullivan's license. It did not engage in an unlawful procedure prohibited under K.S.A. 77-621(c)(5). We deny Sullivan relief on that statutory ground.

*The Board's decision is not unreasonable, arbitrary, or capricious.*

The second statutory ground on which Sullivan seeks relief is K.S.A. 77-621(c)(8). Under that law, a reviewing court may grant relief when the agency action is "unreasonable, arbitrary or capricious." Since we have already concluded that the Board could discipline Sullivan, we must now look at how the Board exercised its discretion. An abuse of discretion occurs when the action taken is arbitrary, fanciful, unreasonable,

or not supported by the facts. An agency's decision is arbitrary and capricious if it is so wide of the mark that its unreasonableness lies outside the realm of fair debate. *Denning v. Johnson County Sheriff's Civil Service Board*, 46 Kan. App. 2d 688, 701, 266 P.3d 557 (2011).

When an agency can act, as the Board did here, we will not substitute our judgment for that of the agency unless the action is unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(8). Sullivan has not met that standard of proof here. Despite the conclusions reported in Sullivan's two evaluations, based on her elevated SASSI defensiveness scores and her DWI, the Program had reasons to require Sullivan to participate in the Program. After all, the purpose of the Program was to monitor a nurse "when there is a question of possible chemical dependency . . . or serious concerns regarding a participant's openness and cooperation with the evaluation." It is reasonable to conclude that Sullivan met that criteria. That conclusion is not so wide of the mark that it is beyond fair debate as explained in *Denning*.

We also note that several of Sullivan's urine samples showed abnormalities that could suggest increased fluid intake to manipulate the results of the drug screen. Sullivan also refused three times to submit to a hair and blood test with no real justification for not submitting a sample, even though one clean test would have successfully ended her participation in the Program. To conclude that she was trying to hide drug or alcohol use is reasonable under those facts. As a result, the Board's decision to revoke Sullivan's license was not unreasonable, arbitrary, or capricious under K.S.A. 77-621(c)(8). It is the Board's serious responsibility to supervise nurses—not the court's.

Because Sullivan has established no statutory grounds for judicial relief under K.S.A. 77-621(c), we affirm the district court's decision upholding the Board's revocation of Sullivan's nursing license.

Affirmed.